2007 ND 179

**Thomas P. AXTMANN and Arel E. Axtmann, Plaintiffs and Appellees**

v.

**Geri CHILLEMI, Michael Jon Natwick, Mainland, Inc., a North Dakota corporation, Main Realty, Inc. d/b/a Main and Company Realtors, a North Dakota corporation, and Mainland Ventures Unlimited, a North Dakota General Partnership, Defendants and Appellants.**

**No. 20070006.**

Supreme Court of North Dakota.

Nov. 14, 2007.

Rehearing Denied Dec. 13, 2007.

David D. Schweigert (argued), and Karen L. McBride (on brief), Bucklin, Klemin & McBride, Bismarck, ND, for plaintiffs and appellees.

Todd D. Kranda (argued), Arlen M. Ruff (on brief), and Daniel J. Nagle (on brief), Kelsch, Kelsch, Ruff & Kranda, Mandan, ND, for defendants and appellants.

VANDE WALLE, Chief Justice.

[¶ 1] Geri Chillemi, Michael Jon Natwick, Main Realty, Inc., and Mainland, Inc. (collectively referred to as "appellants") appealed from a district court judgment piercing the corporate veil of Main Realty, holding Chillemi, Natwick, and Mainland jointly and severally liable for a judgment against Main Realty, and voiding the assignments of real estate listings from Main Realty to Mainland. We affirm the part of the judgment piercing the corporate veil of Main Realty and reverse the part of the judgment imposing liability on Mainland.

I

[¶ 2] According to Chillemi, she and another individual incorporated Main Realty in 1985 to purchase the trade name Main and Company Realtors and "everything that was in it" for $20,000. Chillemi testified Main Realty was "established to put agents on as independent contractors to list and sell real estate," and since 1985, the number of agents working at Main Realty varied from three to fifteen. At the times relevant to this action, Chillemi was the sole shareholder, president, and treasurer of Main Realty, and Natwick

was the vice president and secretary of Main Realty. Chillemi and Natwick resided with each other and are partners in Mainland Ventures Unlimited, a partnership that owns commercial property and leased office space to Main Realty.

[¶ 3] Main Realty's office policies identified Chillemi as the designated broker at Main Realty and required all associates to sign a contract with Chillemi to establish independent contractor status. Main Realty's office policies also provided:

3. GOAL: The goal of Main and Company, Realtors is to provide a good working atmosphere for Realtors who work here, and to provide a tool for the Realtors to earn 100% commissions at least cost to the Realtor.

. . . .

7. COMMISSIONS: Any new agent at Main and Company, Realtors can opt to sign a contract to receive 100% earned commissions or 70% of earned commissions. All sales agents agree to comply with the contract provisions that they sign. If an agent opts to go on a 70% commission contract, they can stay on this contract until the company debt exceeds $5,000.00. At that time, the sales agent must either go on a 50%/50% split or transfer to another Company. If an agent opts to go on the 100% commission contract, their bill must be paid in full by the 10th of the month. There will be a $10.00 per day late fee after the 10th of the month. If the bill is not paid by the 10th of the month, the full bill plus late fees will be taken from their closings until it is paid in full. If the agent's pended closing commissions are not enough money to cover the bill and late fees, the agent can stay at Main and Company REALTORS on a 50/50 commission split, where agent

will be entitled to only 50% of the commission. The 50% paid to the company will NOT be applied to the agent[']s bill. The bill plus late fees must be paid in full out of agent's share of commissions prior to again receiving 100% commissions.

8. EXPENSES: All Realtors on a 100% contract will be required to pay the following: Desk fee, all MLS dues, books, and listing fees, all advertising expenses, all their own promotional advertising, all individual office supplies, all business cards, stationary, envelopes, Purchase Agreements, Listing Contracts, Handy Pads, For Sale Signs, Open House Signs, Sign Installation fees, long distance phone calls, camera and film, and any other expenses incurred over and above the Company Expenses listed in paragraph 9.

9. OFFICE EXPENSES: The monthly office fee will pay for the office rent, office desk and chairs, secretary and related expenses such as FICA, Unemployment Insurance and Workmen's Compensation, telephones and local telephone service, office MLS fees, office Real Estate Commission fees. Copy machine supplies and service, Supra Locks, business liability insurance and office keys.

10. DESK FEE: The desk fee can be raised by the designated broker at Company only if office rent, secretary expenses, or another major expenditure is required by Company that benefits all Realtors at Company.

. . . .

16. All listings belong to the listing agent. The listing agent can establish the commission he/she wishes to charge sellers and Main and Company, Realtors will not set any standard commission. Each agent must determine what they will pay to a selling agent, whether it is a seller representative or a buyer representative. Main and Company, Realtors urges all agents to get seller approval to cooperate commissions with buyer agents. Main and Company, Realtors also discourages any discrepancy in paying commissions differently between buyer and seller representatives, unless it is expressly stated that way by a seller in writing on the listing contract. As owners of your listings, you can transfer, co-list them, sell them, etc., provided that all expenses and rent at the company is paid up to date. If any charges are in arrears, no listings can be transferred either to another agent or to another Company, until payments are made current.

[¶ 4] Chillemi testified Main Realty used a "real estate salesperson contract" with its "sales agents," which said Main Realty was a duly licensed real estate brokerage firm in North Dakota; the parties agreed to comply with North Dakota laws relating to the real estate sales industry; the parties agreed the agent was an independent contractor; the agent "shall receive ONE HUNDRED PERCENT (100%) of any earned commissions, which earned commissions, upon receipt by [Main Realty], shall be paid over to Sales Agent" and "[i]n exchange for receiving these commissions, sales agent agrees to pay a monthly rent and expenses to" Main Realty; in consideration for receiving 100 percent of earned commissions, the agent agreed to pay Main Realty $600 per month in rent by the 10th of each month, which was increased to $650 per month effective May 1, 2002; the contract was month-to-month and could be terminated by Main Realty if the agent failed to pay monthly rent; and the agent automatically forfeited the 100 percent commission and immedi-

ately went to a 50 percent commission if the rent was not paid by the 10th of the month.

[¶ 5] The Axtmanns sued a Main Realty agent and Main Realty regarding the Axtmanns' purchase of a house. In May 2004, a jury decided Main Realty and the individual agent were jointly and severally liable to the Axtmanns for $75,000, plus interest, in economic damages, the individual agent was guilty of fraud and liable to the Axtmanns for $45,500 in exemplary damages, and Main Realty was guilty of fraud and liable to the Axtmanns for $19,500 in exemplary damages. A judgment was filed in that action on June 1, 2004.

[¶ 6] Meanwhile, the April 22, 2004, minutes of a special meeting of the board of directors of Main Realty, which consisted of Chillemi and Natwick, state that three agents had transferred to other companies in the last two weeks, the monthly rent generated from the remaining five agents was insufficient to cover Main Realty's cost of doing business, and it was impossible to get any new agents to transfer to Main Realty. A motion carried to dissolve Main Realty and to submit notice to its landlord, Mainland Ventures, that Main Realty would vacate the premises. Those minutes also state that Natwick would form his own company and transfer his real estate license to that company. Main Realty accepted Natwick's resignation as vice president and secretary and Chillemi filled those vacancies until the corporation was dissolved.

[¶ 7] On May 19, 2004, Natwick incorporated Mainland, Inc. In documents dated between May 21, 2004, and June 1, 2004, Chillemi, as president of Main Realty, signed several "assignment[s] of contract" for listing contracts for agents affiliated with Main Realty, in which Main Realty agreed to relinquish to Mainland all claims for any commissions for the sale of the real estate covered by those listings. The assignments said all commissions would be paid to Mainland at closing and Mainland would be responsible for the listing contract and all aspects of the transaction. Natwick signed the assignments as president of Mainland. According to both Natwick and Chillemi, Mainland did not pay Main Realty any consideration for the assignments of those listings and Chillemi subsequently began working as an agent and independent contractor for Mainland.

[¶ 8] On May 28, 2004, Chillemi closed Main Realty's bank account. According to Chillemi, she received $150.52 when she closed the account and she used that money to pay Main Realty's May phone bill, which was "around [$]400." On June 2, 2004, Chillemi signed a statement of intent to dissolve Main Realty, and the North Dakota Secretary of State subsequently issued a letter involuntarily dissolving Main Realty for failing to file an annual report.

[¶ 9] The Axtmanns subsequently levied on Main Realty's property and obtained $7.52 from a sheriff's sale of office equipment to apply to their judgment against Main Realty. The Axtmanns then sued Chillemi, Natwick, Mainland, Main Realty, and Mainland Ventures, alleging that after the Axtmanns obtained their judgment in the prior action, Chillemi dissolved Main Realty and Natwick incorporated Mainland and that the listing agreements and interests in real estate commissions formerly held by Main Realty were transferred to Mainland for no value. The Axtmanns alleged the transfers of listing agreements were fraudulent transfers and sought a declaration that Mainland was a successor in interest to Main Realty for purposes of collecting the prior judgment against Main Realty, an

order preventing the dissipation of commissions and assets belonging to Main Realty, and an order piercing the corporate veil of Main Realty and imposing personal liability on Natwick and Chillemi for the debts of Main Realty and Mainland.

[¶ 10]  After a bench trial, the district court decided Main Realty's assignments of listing contracts to Mainland were fraudulent transfers under N.D.C.C. ch. 13–02.1 and Mainland was liable for the Axtmanns' judgment against Main Realty as a continuation of Main Realty.  The court also pierced Main Realty's corporate veil and imposed personal liability on Chillemi and Natwick for the Axtmanns' judgment against Main Realty.

## II

[¶ 11]  The appellants argue the district court erred in piercing the corporate veil of Main Realty and holding Chillemi and Natwick personally liable for the Axtmanns' judgment against Main Realty.

[¶ 12]  The officers and directors of a corporation generally are not liable for the ordinary debts of a corporation. *Jablonsky v. Klemm*, 377 N.W.2d 560, 563 (N.D.1985); *Hilzendager v. Skwarok*, 335 N.W.2d 768, 774 (N.D.1983).  Organizing a corporation to avoid personal liability is a legitimate goal and is one of the primary advantages of doing business in the corporate form. *Hanewald v. Bryan's Inc.*, 429 N.W.2d 414, 415 (N.D.1988).  In *Jablonsky*, at 563, however, this Court also said that when the notion of a corporate entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law regards the corporation as an association of persons.

[¶ 13]  In  *Jablonsky*,  377 N.W.2d at 563 (quoting *Victoria Elevator Co. v. Meriden Grain Co., Inc.*, 283 N.W.2d 509, 512 (Minn.1979)), we applied the following factors to determine whether to disregard a corporate entity and pierce the corporate veil:

insufficient capitalization for the purposes of the corporate undertaking, failure to observe corporate formalities, nonpayment of dividends, insolvency of the debtor corporation at the time of the transaction in question, siphoning of funds by the dominant shareholder, nonfunctioning of other officers and directors, absence of corporate records, and the existence of the corporation as merely a facade for individual dealings.

Proof of fraud is not a necessary prerequisite for disregarding the corporate entity, but an element of injustice, inequity, or fundamental unfairness must be present before a court may properly pierce the corporate veil and that element of unfairness may be established by the showing of a number of the requisite factors for piercing the corporate veil. *Jablonsky*, at 563–64.  The essence of the requirement for fairness is that an individual cannot hide from the normal consequences of carefree entrepreneuring by doing so through a corporate shell. *Id.* at 567 (quoting *Labadie Coal Co. v. Black*, 672 F.2d 92, 100 (D.C.Cir.1982)).

[¶ 14]  This Court has also recognized that the attitude toward piercing the corporate veil is more flexible in tort than in contract, because the creditor has an element of choice inherent in a voluntary contractual relationship whereas the ordinary tort case forces the debtor-creditor relationship upon the creditor by the occurrence of an unexpected tort. *Jablonsky*, 377 N.W.2d at 565–66 n. 1. In tort cases, particular significance is placed on whether a corporation is undercapitalized, which involves an added public policy consideration of whether individuals may transfer a risk of loss to the public in the

name of a corporation that is marginally financed. *Id.* In *Jablonsky,* 377 N.W.2d at 566, this Court explained the obligation for adequate capitalization:

> " ' "[t]he obligation to provide adequate [risk] capital begins with incorporation and is a continuing obligation thereafter * * * during the corporation's operations." ' [quoting Gillespie, *The Thin Corporate Line: Loss of Limited Liability Protection,* 45 N.D.L. Rev. 363, 387–388 (1968)]. In *Briggs Transp. Co. v. Starr Sales Co.,* 262 N.W.2d 805, 810 (Iowa 1978), the court stated:
>
> > ' "If a corporation is organized and carries on business without substantial capital in such a way that the corporation is likely to have no sufficient assets available to meet its debts, it is inequitable that shareholders should set up such a flimsy organization to escape personal liability. The attempt to do corporate business without providing any sufficient basis of financial responsibility to creditors is an abuse of the separate entity and will be ineffectual to exempt the shareholders from corporate debts. It is coming to be recognized as the policy of the law that shareholders should in good faith put at the risk of the business unencumbered capital reasonably adequate for its prospective liabilities. If capital is illusory or trifling compared with the business to be done and the risks of loss, this is a ground for denying the separate entity privilege." ' "

[¶ 15] The burden of establishing a basis for piercing the corporate veil rests on the party making the claim, and the resolution of the issue is " 'heavily fact-specific' " and " 'peculiarly within the province of the trial court.' " *Jablonsky,* 377 N.W.2d at 565 (quoting *United States v. Jon–T Chemicals, Inc.,* 768 F.2d 686, 694 (5th Cir.1985)). We review a district court's resolution of the corporate veil issue under the clearly erroneous standard of N.D.R.Civ.P. 52(a). *Jablonsky,* at 565. A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence exists to support the finding, or if, on the entire record, a reviewing court is left with a definite and firm conviction a mistake has been made. *E.g., Mountrail Bethel Home v. Lovdahl,* 2006 ND 180, ¶ 11, 720 N.W.2d 630. Merely because a reviewing court may have viewed the facts differently if it had been the initial trier of fact does not entitle the reviewing court to reverse the district court's findings of fact. *Jablonsky,* at 567.

[¶ 16] Here, the district court found three factors existed to warrant piercing the corporate veil. The court found Main Realty was undercapitalized, it was insolvent and could not pay its debts at the time of the Axtmanns' judgment and for several years before that judgment, and it was a "pass through" corporation with no substantial assets. The court said it would be unfair and unjust not to pierce Main Realty's corporate veil, and the court held Chillemi and Natwick personally liable for the Axtmanns' judgment.

[¶ 17] The appellants argue Main Realty was sufficiently capitalized for its purpose and its inability to pay a large judgment is not evidence of undercapitalization. The appellants claim there must be proof of other factors plus an element of injustice. They assert Main Realty functioned properly for 20 years, and the evidence establishes Main Realty followed corporate formalities, including filing tax returns and holding annual meetings, and paid its bills up to the Axtmanns' judgment. They claim the corporation was intended to provide brokerage services and its manner of operation was similar to other businesses in the real estate industry.

[¶ 18]   Chillemi testified that she and another individual formed Main Realty in 1985 to purchase the trade name Main and Company Realtors from another real estate broker, who had run the business under "the hundred percent commission concept." According to Chillemi, she and the other individual paid $20,000. to buy the trade name and "everything that was in" Main and Company Realtors. The district court found Chillemi "purchased the business twenty years ago for $20,000.00. However, there [was] no evidence that more capital was put into the business after that $20,000.00." The court also found it was foreseeable that Main Realty might be liable for claims by customers, Main Realty failed to make any provisions for assets to cover foreseeable liabilities, and Main Realty was insolvent at the time of the Axtmanns' judgment and for years because it was unable to pay its normal debts and relied upon Chillemi's personal credit to operate. The court said although Main Realty "provided a necessary service to Chillemi, Natwick and the other agents by providing the tools they needed to sell real estate and close on real estate transactions, most notably the brokerage services and the use of a trust account," Main Realty was merely a "pass through" corporation.

[¶ 19]   Under North Dakota law, no person may act as a "real estate broker" or a "real estate salesperson" without a license issued by the real estate commission. N.D.C.C. § 43–23–05. See N.D.C.C. §§ 43–23–06.1(8) and (10); 43–23–08(3) and (4) (defining real estate broker and salesperson and outlining different license standards for each). The licensing standards require a real estate broker to have been actively engaged as a real estate salesperson before becoming a broker and specify that a salesperson be "employed or engaged" by a broker. See N.D.C.C. §§ 43–23–06.1(10) and 43–23–08. No co-partnership, association, corporation, or limited liability corporation may be granted a real estate license unless at least one partner, shareholder, member, manager or officer of the business holds a broker's license and every employee who acts as a salesperson holds a license as a salesperson. N.D.C.C. § 43–23–05. Every person, partnership, association, corporation, or limited liability company licensed as a real estate broker is required to have a definite place of business within North Dakota for the transaction of real estate business and all licenses issued to salespersons shall designate the employer of. the salesperson. N.D.C.C. § 43–23–12. If a salesperson changes employment, prompt notice of the change must be given to the real estate commission with the name of the licensed broker into whose employ the salesperson is about to enter. *Id.* A real estate brokerage firm and its licensees are bound to a client by the duties of loyalty, obedience, disclosure, confidentiality, reasonable care, diligence, and accounting. N.D.C.C. § 43–23–12.1. *See* N.D.C.C. § 43–23–06.1(4) and (9) (defining "designated broker" as licensee designated by real estate brokerage firm to act on behalf of the firm and "real estate brokerage firm" as a person providing real estate brokerage services through that person's licensees and which is licensed by the commission as a real estate brokerage firm). Section 43–23–12.2, N.D.C.C., specifies the duties of a real estate brokerage firm, its licensees, and the clients for wrongful acts, errors, omissions, or misrepresentations by the licensees or by the client. Under N.D.C.C. § 43–23–14.1, brokers must maintain, in the broker's name or the firm's name, a separate trust account in which the broker shall immediately place all funds not belonging to the broker, including funds in which the broker may have some future interest. *See also* N.D.

Admin. Code § 70–02–01–15 (trust account requirements).

[¶ 20] The statutory scheme for real estate transactions contemplates that sales be conducted through a real estate broker and that licensees in a brokerage firm work through the brokerage firm and a designated broker. Main Realty was structured to meet the requirements for a brokerage firm and trust accounts in N.D.C.C. ch. 43–23. The requirements for real estate brokers, brokerage firms, and trust accounts, however, does not mean a business entity may use the corporate form as a shell to avoid foreseeable liabilities. Other than the $20,000 that Chillemi and another used to purchase Main and Company Realtors from a third person when Main Realty was formed in 1985, this record does not reflect there has been any further capital infusion into Main Realty and the business was structured to comply with our real estate statutes without providing any assets to meet foreseeable liabilities. The plain language of Main Realty's agreements with its sales agents and Main Realty's office procedures state that "[a]ll listings belong to the listing agent," and the payment of commissions was structured to comply with the trust account requirement that each sale be through a specified broker.

[¶ 21] Although there is some language in Main Realty's contracts with its agents and in its office policy that provides for different commission percentages in certain cases and the district court stated "[s]ome realtors were 100% commission realtors and paid a fixed fee to the company for rent [and] some realtors were split commission realtors," there is no evidence that any of the commissions for the listings Main Realty assigned to Mainland were based on anything other than a 100 percent commission. To the extent the district court's statement is a finding that some of the agents involved with those listing agreements were split-commission agents, there is no evidence to support a finding to that effect. In the absence of any evidence that Main Realty's agents were entitled to anything other than a 100 percent commission and under the plain language of Main Realty's contracts with its agents, the listing agreements assigned by Main Realty to Mainland belonged to the respective listing agent and had no value to Main Realty. However, it is inconsistent for Main Realty to claim on one hand that the assigned listing agreements were not fraudulent transfers because the agreements did not belong to Main Realty and to claim on the other hand that it had adequate capitalization to satisfy foreseeable liabilities. To the extent the district court decided the listing agreements had value to Main Realty and Main Realty's assignments of those agreements to Mainland were fraudulent and imposed liability on Mainland, we conclude the court erred. Main Realty cannot have it both ways, however, and the fact that those listing agreements belonged to the respective agent and had no value to Main Realty supports the district court's finding that Main Realty was undercapitalized.

[¶ 22] Moreover, the minutes of Main Realty's annual meetings establish that Main Realty was not itself making a profit and had some outstanding credit card debt. The minutes also reflect that Chillemi and Natwick used their commissions to pay Main Realty's credit card debt. Although Main Realty may have operated as a viable entity for several years, there was evidence it struggled to satisfy corporate debts, which must be considered with the evidence about its level of capitalization and the use of the corporation as a "pass through" business for its agents.

[¶ 23] The Axtmanns' underlying judgment against Main Realty was based, in

part, on a jury finding that Main Realty was guilty of fraud. Our analysis in this case is informed by that underlying judgment. In tort cases, a lack of capitalization is particularly significant and involves an added policy consideration of whether individuals may transfer a risk of loss to the public in the name of a corporation that is marginally financed. *Jablonsky*, 377 N.W.2d at 565–66 n. 1. As we recognized in *Jablonsky*, at 567, the essence of the requirement for fairness is that an individual cannot hide from the normal consequences of corporate entrepreneuring by doing so through a corporate shell.

[¶ 24] We are not left with a definite and firm conviction the district court made a mistake, or misapplied the law in piercing Main Realty's corporate veil and imposing personal liability on Chillemi and Natwick. We therefore conclude the court's decision to pierce Main Realty's corporate veil is not clearly erroneous. We further conclude, however, the district court erred in deciding the listing agreements had value to Main Realty and the assignments from Main Realty to Mainland were fraudulent transfers. Moreover, because by terms of the contracts, the listing agreements belonged to the respective listing agents and were not assets of Main Realty, we conclude there is no basis for imposing liability on Mainland as a continuation of Main Realty.

### III

[¶ 25] We affirm the part of the judgment piercing the corporate veil of Main Realty and imposing personal liability on Chillemi and Natwick, and we reverse the part of the judgment imposing liability on Mainland.

[¶ 26] MARY MUEHLEN MARING, J., concurs.

CROTHERS, Justice, concurring in part and dissenting in part.

[¶ 27] I concur with that part of the majority opinion reversing the district court's judgment imposing successor liability on Mainland, Inc., because based on the law unchallenged by the parties and used by the district court, and based on the factual record before the district court, the listing contracts were not the property of Main Realty, Inc.[1] I respectfully dissent from that part of the majority opinion affirming the district court's piercing Main Realty, Inc.'s corporate veil. This dissent is based on my conclusion the district court erred in its application of controlling law, and out of concern this case makes piercing a corporate veil the rule, rather than the exception. As such, this case could provide dangerous precedent susceptible of stifling start-up ventures and exposing small business owners to personal liability well beyond the Legislature's intention.[2]

---

1. I share Justice Sandstrom's concern that the agent's "ownership" of the listing contracts may be contrary to law. However, that issue was not addressed by the district court, was not raised on appeal by either party, and we do not have helpful input by Amicus Curie to analyze the issue. Therefore, that issue is not ripe for consideration and should be left for another day.

2. The holding in this case reaches beyond the North Dakota Business Corporation Act. N.D.C.C. ch. 10–19.1. Personal liability of a member, governor, manager or other agent of a limited liability company is determined by "[t]he case law that states the conditions and circumstances under which the corporate veil of a corporation may be pierced under North Dakota law...." N.D.C.C. § 10–32–29(3). So too, the shield of a limited liability partnership may be pierced under "the case law that states the conditions and circumstances under which the corporate veil or limited liability shield of a corporation may be pierced under North Dakota law...." N.D.C.C. § 45–22–09(1).

[¶ 28] Black letter law provides that corporations are independent, legal entities that generally insulate their owners from personal liability. *See Mann v. Mann,* 57 N.D. 550, 223 N.W. 186, 189 (1929) (citation omitted). The key precept in a properly formed and ordinarily maintained corporation is that a shareholder's liability is limited to the investment in the enterprise. *Hanewald v. Bryan's Inc.,* 429 N.W.2d 414, 416 (N.D.1988) (citing 1 F. O'Neal and R. Thompson, *O'Neal's Close Corporations* § 1.09 (3rd ed. 1987)). The North Dakota Legislature's most recent codification of this principle provides:

> A holder of or subscriber for shares of a corporation is under no obligation to the corporation or its creditors with respect to such shares other than the obligation to pay to the corporation the full consideration of which such shares were issued or to be issued. As such, a shareholder is not personally liable for the acts or debts of the corporation.

N.D.C.C. § 10–19.1–69.

[¶ 29] A corporation's separateness can be avoided under limited circumstances, as has been explained in a major treatise:

> The doctrine of piercing the corporate veil is the rare exception, applied in the case of fraud or certain other exceptional circumstances, and is usually determined on a case-by-case basis. It is equitable in nature. The corporate veil may be pierced and the shareholder held liable for the corporation's conduct when, inter alia, the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the shareholder's behalf. It is a limitation on the accepted principles that a corporation exists independently of its owners, as a separate legal entity, and that the liability of the owners for the debts of the corporation is limited....

The corporate veil may not be pierced absent a showing of improper conduct. The principle of piercing the fiction of the corporate entity is to be applied with great caution, and not precipitately, because there is a presumption of corporate regularity.

> . . . .

The general rule limiting shareholder liability will be abrogated only if applying the corporate fiction would accomplish some fraudulent purpose, operate as a constructive fraud, or defeat some strong equitable claim. Although corporate entities may be disregarded where they are made the implement for avoiding a clear legislative purpose, they will not be disregarded where those in control have deliberately adopted the corporate form in order to secure its advantages and where no violence to the legislative purpose is done by treating the corporate entity as a separate legal person.

A corporate entity may not be disregarded simply because it stands as a bar to a litigant's recovery of property; however, the corporate entity has been disregarded to permit the maintenance of an action.

18 Am.Jur.2d *Corporations* § 47 (2004) (footnotes omitted).

[¶ 30] This Court has long embraced these general rules, with narrow exceptions, succinctly stated as follows:

> There is no doubt of the general rule of authority that a corporation is a legal entity and will be considered as such until there is sufficient cause to consider it otherwise. Corporations, however, cannot be used as a cover under which wrongs may be committed and fraud perpetrated. If corporations are sought to be used as a cover for fraud and wrong, the court will look through the form of the corporation to ascertain its

actual purpose and intent. Cook on Corporations, § 664, contains the following:

> The disabilities of the corporation are not disabilities of the stockholders, nor the disabilities of the stockholders the disabilities of the corporation. Hence it is that a corporation is often organized as a cloak for fraud. Such cases as these are becoming common, and the courts are inclined to ignore the corporate existence when necessary in order to circumvent fraud.

> No corporation can become so securely organized and protected as a legal entity as to become a cover for wrong and fraud and thereby defeat the rights of innocent parties. A corporation cannot be greater than law and equity, nor, by reason of its legal entity, be immune from answering for fraud and wrong. In such case the protecting hands of equity will brush aside the outward forms of the corporate entity, and analyze the foundation purpose and intent of the corporation, and if the purpose and intent of the corporation are not imbedded in good faith, and are but a cover for wrong and fraud against the innocent, the corporate entity will afford no protection for such wrong and fraud in a court of equity.

*Macfadden v. Jenkins,* 40 N.D. 422, 459–60, 169 N.W. 151, 163 (1918).

[¶ 31] A legal test for avoiding separateness between the shareholder and the corporation has evolved:

> It has also been held that factors considered significant in determining whether or not to disregard the corporate entity include: insufficient capitalization for the purposes of the corporate undertaking, failure to observe corporate formalities, nonpayment of dividends, insolvency of the debtor corporation at the time of the transaction in question, siphoning of funds by the dominant shareholder, nonfunctioning of other officers and directors, absence of corporate records, and the existence of the corporation as merely a facade for individual dealings.

*Hilzendager v. Skwarok,* 335 N.W.2d 768, 774 (N.D.1983) (citing *Victoria Elevator Co. v. Meriden Grain Co.,* 283 N.W.2d 509, 512 (Minn.1979)).

[¶ 32] This Court subsequently decided *Jablonsky v. Klemm,* 377 N.W.2d 560 (N.D.1985), where it clarified its discussion about when corporate legal separateness can be ignored. There, the Court stated:

> On several occasions, this court has mentioned some type of inequitable conduct or an inequitable result as a relevant factor in determining whether to pierce the corporate veil. *E.g., Federal Sav. and Loan Ins. Corp. v. Morque,* 372 N.W.2d 872, 876 (N.D.1985) [(]corporate entity "may be disregarded to avoid injustice."[)]; *Danks v. Holland,* [246 N.W.2d 86, 90 (N.D.1976)], [(]no showing of "flagrant wrongdoing" sufficient to pierce corporate veil[)]; *Fire Ass'n of Philadelphia v. Vantine Paint & Glass Co.,* 133 N.W.2d 426, 432 (N.D.1965) [(]nothing "unfair or fraudulent" in the conduct of corporations or individuals, nor was it shown that corporations were "used as a cover for the others for any ulterior purpose."[)] Our adoption of the *Victoria Elevator Co.* factors in *Hilzendager,* without specific mention of the element of injustice or unfairness, was not intended to delete that element, which has long been recognized by this court and others as the fundamental basis for disregarding the corporate entity. *See, e.g., Schriock [v. Schriock,* 128 N.W.2d 852, 866 (N.D.1964)]. We believe that an element of injustice, inequity or fundamental unfairness must be

present before a court may properly pierce the corporate veil.

While we have concluded that an element of unfairness must exist in addition to a number of the factors adopted in *Hilzendager,* we do not imply that the facts upon which the unfairness is found to exist must be mutually exclusive of the facts supporting findings on the *Hilzendager* factors. The factors enunciated in *Hilzendager* were adopted from the Minnesota Supreme Court's decision in *Victoria Elevator Co.,* which in turn adopted those factors from the Fourth Circuit Court of Appeal's decision in *DeWitt Truck Brokers[, Inc. v. W. Ray Flemming Fruit Co.],* 540 F.2d [681,] 685–686 [(4th Cir.1976)]. The Fourth Circuit Court of Appeals indicated that the element of unfairness may be established under appropriate circumstances by the showing of a number of these factors, which, "all fitting into a picture of basic unfairness, has been regarded fairly uniformly to constitute a basis for an imposition of individual liability under the doctrine." *DeWitt Truck Brokers, supra,* 540 F.2d at 687 (footnote omitted). *See also Labadie Coal Co. v. Black,* 672 F.2d 92, 99 (D.C.Cir.1982) [()failure to adequately capitalize the corporation for the reasonable risks of the corporate undertaking may provide the required "injustice"()]; *Eagle Air v. Corroon and Black/Dawson and Co.,* 648 P.2d 1000, 1004–1005 (Alaska 1982) [()draining of corporate assets sufficient to satisfy element of "wrongdoing"().]
*Jablonsky,* 377 N.W.2d at 564.

[¶ 33] Justice Meschke specially concurred in *Jablonsky* to highlight "the closely balanced nature of the evidence on the underlying factual issues in disregarding the corporate form in this case." 377 N.W.2d at 570. Notably, the corporation in *Jablonsky* was capitalized with $19,000

for a project involving six years of residential condominium development and some $1.3 million in sales. *Id.* at 562. The district court "found that although the minimum corporate formalities were observed, DID [the corporation] was insufficiently capitalized; DID became technically insolvent within a year of its incorporation; there was 'some siphoning of funds' by Klemm; the other officers and directors of DID were nonfunctioning; and 'the existence of DID was merely a facade for Klemm's individual dealings.'" *Id.* at 563.

[¶ 34] Justice Meschke agreed with the majority the corporation was inadequately capitalized, stating:

The initial capital was no doubt inadequate for the scope of the project undertaken. Where profits from the corporate venture are insufficient to further fuel the capital needs of the venture, it is difficult to view an initial capitalization this meag[er] in relation to the size of the project as anything but insufficient where substantial liabilities are left. However, the finder of fact might also have viewed the largely uncompensated services of Klemm, the principal officer and stockholder, as additional contribution to capital, rather than as simply another liability contributing to the insolvency of the corporation.

*Jablonsky,* 377 N.W.2d at 570.

[¶ 35] Justice Meschke then addressed the district court's finding of insolvency and warned that the finding in *Jablonsky* should be cautiously followed in other cases:

As to insolvency, the record indicates that, besides these claims, the remaining indebtedness of this corporation was substantially all owed to Klemm alone. In my view, debts to the sole stockholder should not count in piercing the corporate veil. It is the claims pursued in

this action alone which sustain the finding of insolvency here. In another case, a single claim or class of claims would not necessarily, as a matter of fact, sustain a finding of insolvency when the insolvency arises near the end of corporate activity over a period of years.

*Id.*

[¶ 36] Finally, Justice Meschke addressed the extent to which a corporation and its sole shareholder must be, or perceived to be, separate:

It is only in the context of clearly inadequate capitalization that the accompanying findings of "siphoning" and "facade" can be considered sufficient. In another case, the finder of fact might well conclude that a fair profit on several transactions with the corporation would not lead to the inference of diversion of corporate funds by a sole stockholder, particularly where, as here, he drew no salary as an officer and rent owed to him went unpaid. The Chief Justice notes that the fact that Klemm "siphoned" any funds at all is more significant than the amount involved. That may well be true in some instances, but here the finding of "siphoning" seems sustainable only because the amounts exceed initial capital contributed.

Our sustaining the factual finding of "facade" in this case should not be understood as a rule that a sole stockholder cannot do business with his own corporation. That is not the law, nor should it be. Where services are furnished at cost, without gouging, and also are carefully documented, as they apparently were documented in this case, such circumstances alone would not support a finding of "facade" or "pass-through" corporation. I view the evidence in this case as barely sufficient on this point. In a similar case, with better capitalization, I believe such evidence would be insufficient.

*Jablonsky,* 377 N.W.2d at 570–71. Justice Meschke's warnings in *Jablonsky* appear to have become empty noise. *See McCullough v. Swanson,* 245 N.W.2d 262, 265 (N.D.1976) (ignored attorney disciplinary admonitions had become "empty noise").

[¶ 37] Here, Axtmanns sought to pierce the corporation's veil because "Chillemi failed to adequately capitalize Main Realty, Inc. so that it could pay debts as they became due" and because "Chillemi used Main Realty, Inc. as her alter-ego, used the corporation as a facade for personal dealings, and failed to follow corporate formalities."

[¶ 38] The district court concluded "[t]he Corporate Veil of Main and Company [Main Reality, Inc.'s trade name] is pierced and Chillemi and Natwick are personally liable for the judgment against Main and Company." The conclusion was based on the finding that "Main and Company was a shell corporation, which was underfunded and insolvent at the time of the transfer." In turn, the district court's memorandum opinion explained that Main and Company was a "pass through" corporation that justified holding "Chillemi and Natwick, the sole shareholder and the officers/directors of Main and Company individually liable for the judgment."[3]

---

3. The district court imposed personal liability on Chillemi and Natwick as officers and directors of Main Realty, Inc., and on Chillemi as the sole shareholder. Axtmanns' complaint sought to pierce the corporate veil and impose liability only on the shareholder-Chillemi. Appellants have not raised any issues relating to whether officers and directors can properly be subjected to personal liability in a piercing action, or whether the district court granted relief not requested by the plaintiffs in this action. Given the facts of this case, I can anticipate a number of strategic, legal and practical reasons why appellants did not

[¶ 39] The notion of a pass-through corporation being either per se bad or determinative of inequity is misplaced. The corporate entity is used for any number of reasons but is usually related to limited liability of the owner. Such is a recognized and legitimate reason for creating and maintaining a corporation. *Hanewald*, 429 N.W.2d at 415–16. Furthermore, Main Realty, Inc., was a Subchapter S corporation under the Internal Revenue Code. Subchapter S treatment allows closely held corporations meeting certain criteria to pass their income through to the individual shareholders similar to a partnership. 26 U.S.C. § 1361. Thus, shareholders in S corporations pay individual income tax on their pro rata share of corporate income, and the corporation as a separate entity pays no tax. *Id.* As a result, under both corporate law and tax law, S corporations such as Main Realty, Inc., are designed to pass income through the corporation to the owner-shareholder.

Moreover, a shareholder who lets cash accumulate in an S corporation will have a tax liability on income received but will not have cash to pay the tax liability.[4] I therefore believe the district court clearly erred when it pierced the corporate veil based on its conclusions Main Realty, Inc., was a "pass through" or "shell" corporation.

[¶ 40] To the extent it was a separate consideration, I also believe the district court's finding that Main Realty, Inc., was undercapitalized is based on an incorrect application of the law. The district court stated in its memorandum opinion that "Main and Company was undercapitalized and could obviously not pay its debts." This view of the law would hold shareholders of any failing corporation liable for the company's debts.

[¶ 41] A correct application of the law requires examination of the corporations' capitalization at the time of formation. *J–*

---

raise these issues on appeal, and only mention them here so that this opinion is not read to suggest I have implicitly agreed officer and director liability to a third party can or should be accomplished by an action directly based on officer or director activity. *See Wills v. Schroeder Aviation, Inc.*, 390 N.W.2d 544, 547 (N.D.1986) ("An individual is personally responsible 'for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person.' Section 9–10–06, N.D.C.C. It is well settled that '[a] corporate agent cannot shield himself from personal liability for a tort he personally commits or participates in by hiding behind the corporate entity; if he is shown to have been acting for the corporation, the corporation also may be liable, but the individual is not thereby relieved of his own responsibility.' *Oxmans' Erwin Meat Co. v. Blacketer*, 86 Wis.2d 683, 273 N.W.2d 285, 289 (1979). *Accord* § 3–04–02(3), N.D.C.C.; *Reule v. Bismarck Public School Dist.*, 376 N.W.2d 32, 33 (N.D.1985); *Schlosser v. Great Northern Ry. Co.*, 20 N.D. 406, 127 N.W. 502, 504 (1910). *See also* 3A Fletcher, Cyclopedia of the Law of Private Corporations § 1135 (1986); 18B Am. Jur.2d *Corporations* … (1985); *Bagge v. Dar-*

*dis*, 389 N.W.2d 606 (N.D.1986)."). Officer and director liability may also be established through a shareholder derivative action. N.D.C.C. §§ 10–19.1–85.1 and 10–19.1–86. However, I question whether officer or director liability can be established by piercing the corporate veil. *See, e.g., Huffman v. Poore*, 6 Neb.App. 43, 569 N.W.2d 549, 557 (1997) (officer and director liability established on proof of tort and no requirement the corporate veil be pierced). *Cf. Hilzendager v. Skwarok*, 335 N.W.2d 768, 775 (N.D.1983) (veil pierced to hold former officers and directors personally liable for corporate debt).

4. Another factor for piercing a corporate veil is whether the corporation has failed to pay dividends. The court in *Trustees of Graphic Commc'n Int'l Union v. Bjorkedal*, No. 04–3371, 2006 WL 3511767, at *14 (D.Minn. Dec. 6, 2006) noted that "it is rare for small closely-held corporations to pay dividends because such payments would in effect be double-taxed.... The fact that [the corporation] did not pay dividends shows only that its officers were smart, not that [the corporation] was a facade."

*R Grain Co. v. FAC, Inc.,* 627 F.2d 129, 135 (8th Cir.1980) (capitalization measured at formation; losses suffered during operation do not make corporation undercapitalized) and *Kansas Gas & Elec. Co. v. Ross,* 521 N.W.2d 107, 115 (S.D.1994) (same). To the extent it ever might be appropriate to examine capitalization of a going concern, we should look to Justice Meschke's words in *Jablonsky* that "[w]here profits from the corporate venture are insufficient to further fuel the capital needs of the venture, it is difficult to view an initial capitalization this meag[er] in relation to the size of the project as anything but insufficient where substantial liabilities are left." 377 N.W.2d at 570.

[¶ 42] Here, the unchallenged finding is that Main Realty, Inc., was capitalized with $20,000 and owned office furniture, fixtures and equipment that appeared appropriate for six to eight independent contractors who—by express contract—were responsible for the majority of their own selling expenses. In exchange for a monthly fee of $600 and then $650, the corporation provided the independent contractor-selling agents with offices, desks, chairs, a shared secretary, a copy and fax machine, telephones, a trust account, Supra locks, and business liability insurance. Given the limited nature of the corporation's enterprise, and recognizing an annual cash flow in excess of $72,000, I cannot agree that the district court correctly concluded Main Realty, Inc., was undercapitalized at formation. Nor can I agree that, in Justice Meschke's words, Main Realty, Inc., was without profits sufficient to feed the venture's capital needs.

[¶ 43] Justice Meschke's concurrence in *Jablonsky* also recognized that courts should put little or no weight on corporate debt owed to shareholders. When dealing with close corporations such as Main Realty, Inc., I agree with that conclusion.

Here, the only corporate debt owed was to the sole shareholder for office supplies and equipment obtained by her and charged to her credit card. The district court was clearly concerned about the corporation's debt owed to Chillemi and stated, "it could not pay its normal debts and relied upon Chillemi's personal credit to operate." When that credit card obligation is excluded, the only remaining debt is that owed to Axtmanns—which is substantial—but which was not incurred in the ordinary course of business and which should not have been used to determine whether the corporation is sufficiently capitalized.

[¶ 44] For twenty years, income from operations was sufficient to meet Main Realty, Inc.'s capital needs. To conclude otherwise and pierce the corporate veil in this case is to hold that a corporation must ignore all realities of organization, finance, and taxation and have sufficient money in reserve to be able to pay a substantial judgment arising out of the commission of an intentional tort and an award of punitive damages. Such a result is simply too hostile to small businesses, and too far from that which reasonably could have been intended by the Legislature when it enacted N.D.C.C. § 10–19.1–69. I therefore would reverse the district court's judgment.

[¶ 45] Daniel J. Crothers

SANDSTROM, Justice, concurring and dissenting.

[¶ 46] Because I would affirm the district court's judgment, I respectfully concur and dissent from the majority opinion and disagree with the other separate opinion in this case.

[¶ 47] Contrary to the conclusion of the district court, the appealing defendants assert that Main Realty, Inc., had "no interest in" the real estate listings it transferred to Mainland, Inc.

[¶ 48] To the extent that the majority opinion accepts the premise that Main Realty, Inc., had no interest in the listing contracts or that those contracts had no value to it, I respectfully disagree.

[¶ 49] The broker was Main Realty, Inc. As a matter of North Dakota law, the listing contracts are contracts between the owner of the listed property and that broker. *See* N.D.C.C. ch. 43–23. Under statute and under the listing contract, it is the broker who is entitled to receive the commission. *See* N.D.C.C. § 43–23–06.1(8); 15 Richard R. Powell, *Powell on Real Property* § 84C.01[1] (Michael A. Wolf ed., 2000). The obligation of the broker to pay the salesperson some or all of the commission received by the broker is an independent and apparently unsecured obligation. *See* N.D.C.C. § 43–23–06.1(10); 15 *Powell on Real Property* § 84C.01[2].

[¶ 50] Because the listing contracts are an asset of the broker, both plaintiffs here and the salespersons have a potential claim against their value. The transfer of the asset by an undercapitalized, insolvent broker company was fraudulent, as the district court carefully analyzed under the Uniform Fraudulent Transfer Act, N.D.C.C. ch. 13–02.1.

[¶ 51] The regulation of real estate brokers and salespeople by the states is an exercise of their police power "to protect the public from fraud and misrepresentations of dishonest or incompetent persons." 15 *Powell on Real Property* § 84C.02[1]. Our regulatory system and the Fraudulent Transfer Act reflect the correctness of the district court's analysis.

[¶ 52]   Dale V. Sandstrom

KAPSNER, Justice, concurring in part and dissenting in part.

[¶ 53] I concur with the majority holding that affirms piercing the corporate veil of Main Realty and respectfully dissent from the majority holding that reverses the judgment imposing liability on Mainland.

[¶ 54] I dissent from the majority holding that the listing agreements belonged to the respective listing agent and had no value to Main Realty. Although the listing agents had separate contractual agreements that allowed the agent to "own" and to transfer these agreements, the listing agreements themselves were with Main Realty. The trial court found the agreements had value because their existence was the basis for Main Realty receiving either rent or commissions. This is not a clearly erroneous finding.

[¶ 55] Listing contracts were necessary to conduct the business of Main Realty. *See* majority opinion, at ¶¶ 19 and 20. Those contracts were transferred without consideration at a time when the corporation was insolvent. Insolvency, as found by the trial court, related to the inability of the corporation to pay its ongoing debts and to the existence of the Axtmann judgment, which was entered close in time to the contracts being transferred. The trial court found the transfers were made with the actual intent to hinder, delay or defraud the Axtmanns. This finding is not clearly erroneous. Therefore, I dissent from the holding that the transfers to Mainland were not fraudulent. The fraudulent transfers permit the creditor to follow the wrongfully transferred assets into the hands of the transferee. Fraudulent transfers, however, would only allow the Axtmanns to reach the listing agreements fraudulently transferred or their proceeds. N.D.C.C. § 13–02.1–07. The trial court properly ordered this remedy.

[¶ 56] The majority does not discuss the independent basis considered by the trial court for imposing liability upon Mainland for the full amount of the judg-

ment owed to Axtmanns. Rather, the majority opinion blends this independent basis with the analysis of fraudulent transfers. However, each analysis is distinct and the resulting liability is quite different.

[¶ 57] The trial court acknowledges the general rule that a successor corporation is not liable for the debts of the predecessor corporation simply because there has been a transfer of assets. *Weeda's Bath & Kitchen Shop v. Adams, Inc.*, 347 N.W.2d 118, 121 (N.D.1984). However, as noted in *Weeda's:*

> There are, however, four well-recognized exceptions to the general rule under which liability may be imposed on a purchasing corporation:
>
> 1. Where there is an express or implied agreement to assume the transferor's liabilities;
>
> 2. Where the transaction amounts to a consolidation or merger of the two corporations;
>
> 3. Where the transferee corporation is merely a continuation of the transferor corporation; or
>
> 4. The transaction is an attempt to defraud the creditors of the corporation. *Leannais v. Cincinnati, Inc.*, 565 F.2d 437 (7th Cir.1977); *Cyr v. B. Offen & Co., Inc.*, 501 F.2d 1145 (1st Cir.1974). A further exception has been recognized where some of the elements of a purchaser in good faith are absent. *Cyr v. B. Offen & Co., Inc., supra* 501 F.2d at 1152.

*Weeda's,* at 121.

[¶ 58] The four exceptions have been generally recognized, 15 William Meade Fletcher, *Cyclopedia Corporations* § 7122, at 218–55 (Perm. ed. 1999), though rarely applied. *Weeda's,* at 121; *Mitchell Mach., Inc. v. Ford New Holland, Inc.*, 918 F.2d 1366, 1370–71 (8th Cir.1990).

[¶ 59] The successor corporation will be liable for the debts of the selling company when it is a mere continuation of the selling company. *Fletcher* § 7123, at 68–69 (Supp.2007). *See, e.g., Keller v. Clark Equip. Co.*, 715 F.2d 1280, 1291–92 (8th Cir.1983); *300 Pine Island Assocs., Ltd. v. Steven L. Cohen & Assocs., P.A.*, 547 So.2d 255, 255–56 (Fla.App.1989); *Jackson v. Diamond T. Trucking Co.*, 100 N.J.Super. 186, 241 A.2d 471, 477 (L.Div.1968). The trial court applied the five factors analyzed in *Jackson* to impose successor liability:

> (1) transfer of corporate assets (2) for less than adequate consideration (3) to another corporation which continued the business operation of the transferor (4) when both corporations had at least one common officer or director who was in fact instrumental in the transfer ... and (5) the transfer rendered the transferor incapable of paying its creditors' claims because it was dissolved in either fact or law.

*Jackson,* at 477.

[¶ 60] The trial court found each of the five factors announced in *Jackson* applied to the facts of this case. Thus, the transferee corporation, Mainland, a continuation of the transferor corporation, Main Realty, is liable for the entire debt of Main Realty to the Axtmanns. I would affirm this holding of the trial court.

[¶ 61] I would share Justice Crothers' concerns for the manner in which undercapitalization was analyzed in this case and for the application of the pass-through nature of the corporation as an independent factor to support piercing the corporate veil if this were an ongoing corporation. However, this was an insolvent corporation whose officers and directors formed a plan to continue the essential operations of the corporation under a different shell without paying the corporate debt. The transfer of the corporate assets was made

without consideration. The officers, directors, and sole shareholder thus "siphoned off" the assets of a corporation to allow them to continue business under a new shell to their personal benefit. Piercing is appropriate under such circumstances. *Hilzendager v. Skwarok*, 335 N.W.2d 768, 774–75 (N.D.1983). Under these circumstances, sufficient evidence exists to find the legal entity is being used to defeat public convenience, justify wrong, and protect fraud. *Schriock v. Schriock*, 128 N.W.2d 852, 866 (N.D.1964). As noted by the majority, factors that support piercing are heavily fact-specific, and where there are fraudulent transfers that benefit the officers, directors, and sole shareholder, those elements of injustice, inequity, or fundamental unfairness are present. *Jablonsky v. Klemm*, 377 N.W.2d 560, 563 (N.D.1985). I join in the majority holding piercing the corporate veil and making Chillemi and Natwick personally liable for the debt owed to Axtmanns.

[¶ 62]   Carol Ronning Kapsner