Filed 2/1/07 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

2007 ND 12

B. J. Kadrmas, Inc., Plaintiff and Appellee

v.

Oxbow Energy, LLC, Defendant and Appellant

No. 20060137

Appeal from the District Court of Stark County, Southwest Judicial District, the Honorable Allan L. Schmalenberger, Judge.

AFFIRMED.

Opinion of the Court by Sandstrom, Justice.

Gary D. Ramsey, Greenwood & Ramsey, PLLP, 30 First Avenue East, P.O. Box 1157, Dickinson, N.D. 58602-1157, for plaintiff and appellee.

Timothy A. Priebe (argued) and Jennifer Grosz (on brief), Mackoff, Kellogg, Kirby & Kloster, P.C., 46 Second Street West, P.O. Box 1097, Dickinson, N.D. 58602-1097, for defendant and appellant.

B.J. Kadrmas, Inc. v. Oxbow Energy

No. 20060137

Sandstrom, Justice.

[¶1] Oxbow Energy, LLC, appeals from a district court judgment ordering it to pay for services under an implied contract with B.J. Kadrmas, Inc.  Concluding that the facts and surrounding circumstances, as well as the district court’s resolution of conflicting testimony, support the conclusion that the parties mutually intended to form a binding legal obligation, we affirm.

I

[¶2] At trial, Robert Angerer of Oil For America (“OFA”) testified that he met with Bev Kadrmas in December 2003 to discuss having her company perform title searches on lands whose mineral rights had multiple owners.  Angerer refers to these tracts as “pro-splits.”  Angerer testified that OFA had developed a new method of finding oil through the use of aerial photography.  Another oil exploration company, Petrosearch, had used OFA’s technology to drill a successful well in the Williston Basin.  According to Angerer, OFA had mapped over a million acres in its search for new oil and gas deposits.  OFA had already leased large portions of these mapped areas, but had skipped tracts Angerer thought might be difficult to lease—mostly the tracts with fractionalized mineral right ownership.  Angerer explained that it had a contract with Petrosearch and Oxbow to allow those companies to drill wells on land OFA had leased or sought to lease.  Angerer said that a failure to drill on leased lands would ultimately result in a loss of the right to explore for oil there.  As such, OFA agreed to provide some of its mapped acreage to Petrosearch and Oxbow in exchange for a share of any resulting profits from wells those two companies drilled.  Because this acreage had multiple mineral right ownership, Angerer planned to have an experienced title company organize and streamline the title search process to reduce duplicative analysis for those tracts whose mineral ownership overlapped or “ran common” among the three oil companies.  Angerer testified that he asked Kadrmas to make separate agreements with him on behalf of OFA, Dan Denton for Petrosearch, and Tony Martin for Oxbow.  OFA and Petrosearch both signed contracts with Kadrmas in December 2003 and later paid Kadrmas for their portion of the title work, which included a preliminary assessment of the tracts to organize the overall undertaking; however, Oxbow did not.

[¶3] Kadrmas testified that Martin told her to proceed with Oxbow’s share of the title work during a telephone conversation on January 10, 2004.  Later that same day, Kadrmas sent Martin a letter that she says memorialized her conversation with him.  She also testified that she enclosed a contract for Martin to sign.  Martin denies giving Kadrmas the order to proceed; instead, he testified, he only asked for a cost estimate.  Martin testified that he received the Kadrmas contract but that he disagreed with its terms and shredded it.  He also testified that he notified Kadrmas that he found the contract “not acceptable” and “too generic.”  Kadrmas testified that it was not until March 2004 that she realized the Oxbow contract had never been returned.

[¶4] The district court found that the factual accounts presented by both parties “could not be further apart” but that Kadrmas presented “the most consistent and credible” evidence.  It found that “[t]he letters, emails, and other documentation make [Kadrmas’s] testimony more believable and consistent” and concluded that “the facts would at least support the conclusion of an implied contract if not an expressed contract.”  The district court ordered Oxbow to pay Kadrmas $17,613.38 plus interest.

[¶5] The district court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. § 27-05-06.  The appeal was timely under N.D.R.App.P. 4(a).  This Court has jurisdiction under N.D. Const. art. VI, § 6, and N.D.C.C. § 28-27-01.

II

[¶6] Oxbow argues that there was no contract and that the district court erred by including work done before it communicated with Kadrmas about the project and after it told Kadrmas to stop all title work on its behalf.

A

[¶7] In 
Lonesome Dove Petroleum, Inc. v. Nelson
, we explained the standard of review for the resolution of contract issues on appeal:

The existence of a contract is a question of fact for the trier of fact.  
Stout v. Fisher Industries, Inc.
, 1999 ND 218, ¶ 11, 603 N.W.2d 52; 
Jones v. Pringle & Herigstad, P.C.
, 546 N.W.2d 837, 842 (N.D. 1996).  The trier of fact determines whether a contract is intended to be a complete, final, and binding agreement.  
Jones
, at 842.  Our review of these questions is governed by the “clearly erroneous” standard under N.D.R.Civ.P. 52(a).  
Jones
, at 842.  Under that standard, a finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence exists to support it, or if, on the entire record, we are left with a definite and firm conviction a mistake has been made.  
Bleth v. Bleth
, 2000 ND 52, ¶ 8, 607 N.W.2d 577.

2000 ND 104, ¶ 15, 611 N.W.2d 154.  Furthermore, in a bench trial, the district court determines credibility issues, which we will not second-guess on appeal.  
Buri v. Ramsey
, 2005 ND 65, ¶ 10, 693 N.W.2d 619 (internal quotations and citation omitted).  “‘We do not reweigh evidence or reassess credibility, nor do we reexamine findings of fact made upon conflicting testimony.  We give due regard to the trial court’s opportunity to assess the credibility of the witnesses, and the court’s choice between two permissible views of the evidence is not clearly erroneous.’”  
Id.
 (quoting 
Akerlind v. Buck
, 2003 ND 169, ¶ 7, 671 N.W.2d 256).

[¶8] Oxbow’s representative, Tony Martin, presented a factual account that could be construed as a mere negotiation.  From his perspective, it could be inferred that he had rejected all of Kadrmas’s offers, because he never signed the contract, or had made a counteroffer by requesting a cost estimate.  Martin testified that upon receipt of the Kadrmas cost estimate on February 7, 2004, he told Kadrmas on February 9, 2004, that “she was not to proceed with any work for Oxbow Energy, LLC.  Period.  Period.  ‘Do not proceed.  Do not do any work for Oxbow Energy.’  Not, you know, industry standards and you can keep doing what’s ever out there, or anything else.  No.  Do not do anything—any work for Oxbow Energy, LLC.”

[¶9] On the other hand, Kadrmas testified that Oxbow agreed to her terms over the telephone on January 10, 2004.  The record contains a letter Kadrmas sent to Oxbow and Petrosearch that same day that reiterated the terms of their agreement.  Martin admitted receiving the Kadrmas contract; therefore, the district court could have reasonably inferred that Martin also received the accompanying letter.  In that letter, Kadrmas also included invoices for the preliminary work done to organize her efforts to avoid duplicative title searches.  As such, Martin likely knew Kadrmas was working on Oxbow’s behalf and did nothing to stop her.

[¶10] Because the district court was given a choice between two permissible views of the evidence, its findings of fact are not clearly erroneous.  Our analysis then turns to the law of contract formation, to which we will apply Kadrmas’s version of the facts.

B

[¶11] “To create an enforceable contract, there must be a mutual intent to create a legal obligation.”  
Lire, Inc. v. Bob’s Pizza Inn Restaurants, Inc.
, 541 N.W.2d 432, 434 (N.D. 1995) (citing N.D.C.C. §§ 9-01-02; 9-03-01).  “The parties’ mutual assent is determined by their objective manifestations, not their secret intentions.”  
Lire, Inc.
, 541 N.W.2d at 434 (citing 
Nat’l Bank of Harvey v. Int’l Harvester Co.
, 421 N.W.2d 799, 804 (N.D. 1988); 
Amann v. Frederick
, 257 N.W.2d 436, 439 (N.D. 1977)).  “A contract is either express or implied.  An express contract is one the terms of which are stated in words.  An implied contract is one the existence and terms of which are manifested by conduct.”  N.D.C.C. § 9-06-01; 
cf.
 
Estate of Zent
, 459 N.W.2d 795, 798 (N.D. 1990) (A contract implied in law or a claim of unjust enrichment is a fiction of law adopted to achieve justice where no true contract exists.).  “Under contracts implied in fact, the court merely attempts to determine from the surrounding circumstances what the parties actually intended.” 
 Bismarck Hospital Ass’n v. Burleigh County
, 146 N.W.2d 887, 893 (N.D. 1966) (internal citations and quotations omitted).

[¶12] “Where the parties have agreed on the essential terms of a contract, the fact they contemplated a further writing memorializing the agreement does not prevent enforcement of the contract.”  
Lonesome Dove Petroleum, Inc.
, 2000 ND 104, ¶ 18, 611 N.W.2d 154.  Essential contract terms depend on the context of the agreement.  
See, e.g.
, 
Lire, Inc.
, 541 N.W.2d at 434-35 (“a non-competition agreement for the selling of Italian type foods for a period of 5 years and within a radius of 60 miles of Rugby . . . completely describe the type of business restriction, the duration of the restriction, and the geographic limitation for the restriction”); 
Union State Bank v. Woell
, 434 N.W.2d 712, 717 (N.D. 1989) (“Essential terms of an oral contract to continue lending money in the future include the amount and duration of the loans, interest rates, and, where appropriate, the methods of repayment and collateral for the loans, if any.”).  “[I]t is the intent of the parties which controls, and a binding agreement is created unless the parties intended there be no agreement until a writing is signed.”  
Lonesome Dove Petroleum, Inc.
, at ¶ 19.

[¶13] “It is a general rule of law that silence and inaction, or mere silence or failure to reject an offer when it is made, do not constitute an acceptance of the offer.  However, under some circumstances, silence and inaction operate as an acceptance, as where, under the circumstances, an inference of assent is warranted, or at least where, under the circumstances, such an inference is required or is necessary.”  17A Am. Jur. 2d 
Contracts
 § 103 (1991) (footnotes omitted) (citing 
Lechler v. Montana Life Ins. Co.
, 48 N.D. 644, 186 N.W. 271 (1921)).  “[W]here the relations between parties have been such as to justify the offerer in expecting a reply, or where the offeree has come under some duty to communicate either a rejection or acceptance, his failure to communicate his rejection or to perform this duty may result in a legal assent to the terms of the offer.”  
Lechler
, 48 N.D. at 653, 186 N.W. at 274.  
“A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it so far as the facts are known or ought to be known to the person accepting.” N.D.C.C. § 9-03-25.

[¶14] Because there is no physical record of the January 10, 2004, telephone conversation between Martin and Kadrmas, and because both parties offered materially different accounts of what was discussed, we cannot say that the district court clearly erred in finding mutual assent.  The order of the communications is critical to an accurate analysis of offer, counteroffer, acceptance, modification, and the like.  The district court concluded that an implied in fact contract existed between the parties, rather than an express oral contract.  The surrounding circumstances and conduct of the parties were relevant to ascertaining whether they intended to form a binding legal agreement.

[¶15] Oxbow argues that Kadrmas’s use of written contracts establishes that the district court erred.  Kadrmas testified that she explained to Martin her daily labor rate, additional expenses charged, and the land tracts to be searched in the written contract she sent to Oxbow.  By her own testimony she believed that Oxbow had signed the contract and returned it.  It was March 2004 before she realized this had not happened.  Therefore, it would be reasonable to conclude, solely from Kadrmas’s testimony, that she intended that the written contract was to be the final expression of her intent to form a binding agreement with Oxbow.  On the other hand, Kadrmas testified that her company did not have a system established to check for the return of signed contracts.  Therefore, the fact that the other companies, Petrosearch and OFA, both signed and returned contracts does not necessarily weigh against Kadrmas, because she may not have known those contracts had been returned either.  Kadrmas hired additional workers and incurred substantial expenses based on the circumstances of this arrangement and the conduct of the parties.

[¶16] Kadrmas began work on the project in December 2003, about one month before she spoke with Martin; however, she dutifully kept Martin informed on the progress of the work she was doing on his company’s behalf.  These communications began as early as January 10, 2004, evidenced by the letter Kadrmas sent with the unsigned contracts and invoices for work her company had already done to organize the title search project.  The contract, dated December 15, 2003, contained two exhibits:  one listing the tracts to be searched and another providing Kadrmas’s daily rate plus a lengthy list of additional expenses, such as motel costs, meals, mileage, phone/fax/cell, internet, notary fees, postage, photocopies, title fees, maps, transportation costs, and miscellaneous office supplies.  The attached invoices included charges under many of these categories and provided a detailed accounting of wage rates, additional expenses, and dates for work performed.  One party’s billing another for work done prior to any communication with the other party might seem unusual; however, in this case, Angerer coordinated the leasing project to reduce all three companies’ costs.  Angerer sent Denton an e-mail dated December 10, 2003, which copied Martin, that explained the concept:

There are 12 or 13 pro-splits.  [Kadrmas] has had to deal with the pros many times and knows their idiosycracies [sic] . . . I would do no more than identify the quarter section or half section as needed.  [Kadrmas] is also working with 20 odd pro-splits that Tony [Martin] is paying to have done and working with him directly.  I also gave her 7 odd pro-splits for OFA.  With all these pro-splits it will make it easier for her to aggregate and deal.  I only asked her to tell me the status of her leasing so I may continue to map what we have under option or lease.  She will take her instructions from you, Tony, and me as to our individual prospects.

Doubt on Martin’s part could have been eliminated by contacting Kadrmas or Angerer with questions regarding the attached invoices or the nature of the leasing project.  The record contains two e-mail messages from Martin to Kadrmas dated January 12 and 13, 2004, that confirm Martin had Kadrmas’s correct contact information.  On January 21, 2004, Kadrmas sent another letter to Martin that detailed a January 14, 2004, meeting she had with Angerer.  In that letter, Kadrmas explained that she had hired additional landmen and notified Martin that he would be receiving title reports “soon.”  This letter also included invoices for the January 1-

15, 2004, pay period.  The next communication by Martin was an e-mail dated January 26, 2004, updating Kadrmas with his contact information.

[¶17] The record contains no evidence that Martin or any other Oxbow representative ever notified Kadrmas via letter or e-mail that it had not accepted the terms of the contract or that it had a question about the contract, nor did anyone dispute the steady flow of invoices detailing the work Kadrmas was doing.  This placed resolution of the conflicting testimony with the district court.  At no time prior to February 9, 2004, did Oxbow respond to Kadrmas in writing to dispute the invoices, the daily wage rate, the additional expenses, the list of land tracts, or the method of organizing or executing the title searches.  Oxbow sat by until the bulk of the work had been done.  Martin testified that he never opened the reports he received from Kadrmas; however, the district court could reasonably conclude that his company benefitted from the title work:  Oxbow used Kadrmas to aid it in a feasibility study for the oil exploration project.  The very estimate Kadrmas provided to Oxbow on February 7, 2004, was based on substantial work already completed on Oxbow’s behalf—which began in December 2003.  According to Kadrmas’s testimony, an estimate for this type of work was difficult, because a tract of land could have hundreds of mineral owners.  That fact would not be known until the title documents were analyzed.  Kadrmas had previously explained this to Martin, but she provided a rough estimate anyway.  In an e-mail to Martin dated February 7, 2004, Kadrmas estimated the future monthly billing based on a 
previous billing period
:  “I combined the total of OFA, Petrosearch and Oxbow billings for this pay-period and doubled it (2 pay-periods per month) and divided it by 3 and I think that the statements will run about $10,000 per month with the landmen I have present.”  Martin was apprised once again that Kadrmas was working on Oxbow’s behalf.  By February 7, 2004, Kadrmas had billed Oxbow over $17,000.  Kadrmas testified that on February 9, 2004, Martin put the title work “on hold”; however, she also testified that Martin told her to finish the work on tracts in progress.  Because the district court found Kadrmas’s testimony more consistent and credible than Martin’s, it concluded that Oxbow owed Kadrmas for work done as late as February 16 and 27, 2004, reflecting that it found Martin had told Kadrmas to complete the work on tracts in progress.

[¶18] The district court’s findings of fact are not clearly erroneous, and its conclusions of law are supported by its findings.

III

[¶19] We affirm the district court judgment.

[¶20] Dale V. Sandstrom

Daniel J. Crothers

Mary Muehlen Maring

Carol Ronning Kapsner

Gerald W. VandeWalle, C.J.