2008 ND 163

**COUGHLIN CONSTRUCTION CO., INC., Plaintiff and Appellee,**

v.

**NU–TEC INDUSTRIES, INC., Ronald J. Balzer, Rudy Balzer, James Balzer, Defendants and Appellants,**

and

**Nils Nordin, individually, Defendant.**

**No. 20070311.**

Supreme Court of North Dakota.

Sept. 4, 2008.

Collin P. Dobrovolny, McGee, Hankla, Backes & Dobrovolny, Minot, N.D., for plaintiff and appellee.

Duane A. Lillehaug, Maring Williams Law Office, Fargo, N.D., for defendants and appellants.

SANDSTROM, Justice.

[¶ 1] Nu–Tec Industries, Inc. ("Nu–Tec"), Ronald J. Balzer, Rudy Balzer, and James Balzer appeal from a judgment and amended judgment awarding Coughlin Construction Company, Inc. ("Coughlin"), $151,122 in damages, costs, and fees for breach of a construction contract. They also appeal from an order denying their motion for amended findings. We conclude the district court's award of damages

is not clearly erroneous and the court did not err in piercing the corporate veil of Nu–Tec. We affirm.

I

[¶ 2] On May 6, 2002, Coughlin, as the general contractor, entered into a contract with the City of Minot to construct the 16th Street Railroad Underpass Project for approximately $3.1 million. Coughlin accepted a bid from Nu–Tec, as a subcontractor, to install two 600–foot replacement water lines on the project for approximately $99,000. The plans and specifications authorized the use of directional drilling to install the new water lines with 20–inch and 24–inch high-density polyethylene ("HDPE") pipe. Although Nu–Tec was to install the pipe, Coughlin was responsible for purchasing the pipe and fusing the sections together under the parties' standard subcontract agreement. Coughlin supplied the HDPE pipe in 50–foot sections, which it fused into single 600–foot pieces before Nu–Tec began installation.

[¶ 3] Nu–Tec began installing the water lines on June 24, 2002. Nu–Tec successfully installed the 20–inch HDPE water line pipe but encountered problems while attempting to install the 24–inch pipe. On June 29, 2002, the 24–inch pipe became stuck at approximately one-half of the way through the 600–foot pull. During the following month, Nu–Tec unsuccessfully attempted to install or extract the 24–inch pipe from the ground. Coughlin, exercising its rights under the subcontract agreement, notified Nu–Tec that it was terminating its employment and that Nu–Tec would be obligated to pay the costs Coughlin incurred for installing the remainder of the 24–inch pipe. Coughlin completed installation of the 24–inch water line with its own employees and equipment using open trench construction techniques and ductile iron pipe with fusion couplers.

Coughlin used the 24–inch HDPE pipe pulled in by Nu–Tec and installed an additional 300 feet of ductile iron pipe.

[¶ 4] In July 2004, Coughlin sued Nu–Tec for damages on the basis of theories of breach of contract, guarantee, and negligence. Coughlin sought compensation for the cost of installing the remainder of the 24–inch water line, for the work it performed and equipment it provided, and for acceleration costs incurred. Coughlin also sought to pierce the corporate veil of Nu–Tec and hold its shareholders personally liable.

[¶ 5] During the bench trial, Nu–Tec argued the 24–inch pipe became stuck because of unanticipated soil conditions. Coughlin presented expert testimony that the pipe became stuck because Nu–Tec failed to add water ballast to the pipe and tried to pull it through the ground with under-powered machinery. The district court found the opinion of Coughlin's expert witness was more persuasive and ruled Nu–Tec had breached its subcontract with Coughlin by failing to perform. The court awarded Coughlin $119,675.85 in damages and $31,446.15 in costs and fees, for a total judgment of $151,122 plus interest. The court also ruled it was appropriate to pierce the corporate veil of Nu–Tec, a closely-held family corporation consisting of the Balzers, and held the Balzers jointly liable for the judgment. The court denied Nu–Tec's motion to amend the findings and judgment.

[¶ 6] The district court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. § 27–05–06. The appeal of Nu–Tec and the Balzers is timely under N.D.R.App.P. 4(a). This Court has jurisdiction under N.D. Const. art. VI, §§ 2 and 6, and N.D.C.C. § 28–27–01.

II

[¶ 7] Nu–Tec and the Balzers argue the district court erred as a matter of law

in awarding damages, because it impermissibly granted Coughlin a double recovery for completing the installation of the 24-inch pipe.

[¶ 8] Nu–Tec and the Balzers argue Coughlin was paid twice for installing the 300 feet of pipe because it received payment from the City of Minot for completing that part of the work, it was awarded damages for the full amount of its extra expenses for completing the installation, and it kept the amount it would have otherwise paid Nu–Tec for the work. Relying on N.D.C.C. § 32–03–36, which states in part, "no person can recover a greater amount in damages for the breach of an obligation than the person could have gained by the full performance thereof," they contend Coughlin impermissibly received $27,000 more than it would have received through Nu–Tec's full performance of the contract.

[¶ 9] Nu–Tec and the Balzers acknowledge this issue was not expressly raised at any point in the district court proceedings, but contend "the damages 'battle' was framed by both parties in very general terms" and the court had a duty to correctly apply the law on the proper measure of damages to the facts and arrive at a correct damages calculation. This argument is not persuasive, because it conflicts with several well-established principles of appellate review. First, their argument implies that district court judges are obligated to arrive at the correct amount of damages regardless of input and objections by the parties. However, judges "are not ferrets" who "engage in unassisted searches of the record for evidence to support a litigant's position." *State v. Noack*, 2007 ND 82, ¶ 8, 732 N.W.2d 389. Moreover, we do not review a damages issue de novo, but apply the clearly erroneous standard of review. *E.g., Hanson v. Boeder,* 2007 ND 20, ¶ 7,

727 N.W.2d 280. Second, the appellants' attorney on appeal is not the same attorney who represented them at trial, and new counsel on appeal is limited to the same issues that prior counsel would have been able to raise. *E.g., State v. Wiest,* 2001 ND 150, ¶ 6 n. 2, 632 N.W.2d 812; *Klem v. Greenwood,* 450 N.W.2d 738, 743 (N.D.1990). Third, this Court does not address new issues raised for the first time on appeal. *E.g., Knife River Coal Mining Co. v. Neuberger,* 466 N.W.2d 606, 608 (N.D.1991). For example, in *Robert v. Aircraft Inv. Co., Inc.,* 1998 ND 62, ¶ 14, 575 N.W.2d 672, the appellant claimed the amount for cost of repair damages in a tort case should have been reduced by the salvage value of an engine, propeller, and core. This Court declined to address the issue because a "reduction for the value of salvage was not sought at trial," and " '[w]e do not consider questions that were not presented to the trial court and that are raised for the first time on appeal.' " *Id.* (quoting *Messer v. Bender,* 1997 ND 103, ¶ 10, 564 N.W.2d 291). The situation in this case is no different. As with other issues that arise during a trial, objections to damages must be raised in the district court to preserve those issues for appellate review.

[¶ 10] We reject the appellants' attempt to raise this issue for the first time on appeal and decline to address it.

III

[¶ 11] Nu–Tec and the Balzers argue the district court erroneously failed to offset the damages by $13,000 for the value of the unused 24–inch pipe. They claim Coughlin, under its duty to mitigate damages, should have sold the unused pipe.

[¶ 12] "A person injured by the wrongful acts of another has a duty to mitigate or minimize the damages and

must 'protect himself if he can do so with reasonable exertion or at trifling expense, and can recover from the delinquent party only such damages as he could not, with reasonable effort, have avoided.'" *Boeder*, 2007 ND 20, ¶ 8, 727 N.W.2d 280 (quoting *Lochthowe v. C.F. Peterson Estate*, 2005 ND 40, ¶ 21, 692 N.W.2d 120). Whether a party has made a good-faith effort to mitigate damages is a finding of fact that will be set aside on appeal only if it is clearly erroneous. *Ruud v. Larson*, 392 N.W.2d 62, 63 (N.D.1986). A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, after review of the entire record, we are left with a definite and firm conviction a mistake has been made. *Thompson v. Olson*, 2006 ND 54, ¶ 10, 711 N.W.2d 226.

[¶ 13] Nu–Tec and the Balzers rely on Ronald Balzer's testimony that in July 2002 approximately 300 feet of 24-inch HDPE pipe could be purchased "for $13,000 freighted to Minot," and Coughlin made no attempt to sell the leftover pipe. However, the president of Coughlin testified the pipe could not be used on the project and had no value:

> Q. [I]s there a market or was there a market for that pipe to be sold to be used as water pipe or HDPE, high pressure pipe, after it had been fused together and then cut off and then cut up again?
>
> A. It would have been extremely hard to sell that pipe legitimately in the marketplace. I would've had to tell the truth that it had been cut and refused—that was obvious. And then, the fact that it had been stretched and there were some concerns about that. And it was fairly scratched up by the time it had gotten out to the bone yard.
>
> Q. Based upon your experience in the construction business, was there value to

selling that pipe? Could you have sold that pipe to another city, county, or someone who may have needed 300 or 350 feet of plastic pipe?

> A. I seriously doubt that I could've sold it as water pipe to anyone.

[¶ 14] "A choice between two permissible views of conflicting evidence is not clearly erroneous." *Barth v. Barth*, 1999 ND 91, ¶ 13, 593 N.W.2d 359. We conclude the district court did not err in declining to offset the damage award by $13,000 for Coughlin's alleged failure to mitigate damages.

[¶ 15] Nu–Tec and the Balzers also claim Coughlin failed to mitigate its damages because it rejected Nu–Tec's alleged offer to redrill the 24-inch water line. Coughlin contended that Nu–Tec did not propose any redrilling options, and those options were, in any event, unfeasible. Nu–Tec contended Coughlin simply rejected its workable plans for completing the 24-inch water line. The district court found:

> [T]he proposed "fixes" outlined in the preceding paragraph were never *officially* communicated to anyone in authority at Coughlin by anyone in authority at Nu–Tec. There may well have been some informal discussions about the *possibility* of doing these things, but it does not appear that these discussions resulted in any *definite* proposals from Nu–Tec to Coughlin.... However, even if these two (2) "fixes" *had* been *officially* communicated to Coughlin, in a timely manner, the Court is not persuaded that either of them would have been "the answer" to this problem.
>
> As both John Coughlin and Alan Estvold (the Field Engineer on this project) pointed out, there would have been little or no room for Nu–Tec to have drilled an entirely new hole. Nu–Tec would

have to have moved over at least three (3) feet to the west of the existing hole, and with the number of underground facilities already in place in the immediate area of the proposed re-drill, there just wasn't an extra three (3) feet of undisturbed soil to accommodate a new hole.

As for the suggestion that pipe be pulled in from the north and "married up" with the pipe which was stuck in the ground, testimony from Duane Haugen, John Coughlin, Hugh O'Donnell and Alan Estvold convinces the Court that this would have been an extremely difficult, time-consuming and expensive process which offered only a marginal chance of success.

[¶ 16]   The district court's findings are not clearly erroneous and establish Coughlin did not fail to mitigate its damages.

[¶ 17]   We conclude the court's award of damages is not clearly erroneous.

## IV

[¶ 18]   Nu–Tec and the Balzers argue the district court misapplied the law in piercing Nu–Tec's corporate veil.

[¶ 19]   Although the officers and directors of a corporation generally are not liable for the ordinary debts of a corporation, *Axtmann v. Chillemi*, 2007 ND 179, ¶ 12, 740 N.W.2d 838, the corporate veil may be pierced when the legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime. *Intercept Corp. v. Calima Fin., LLC*, 2007 ND 180, ¶ 15, 741 N.W.2d 209; *see also Red River Wings, Inc. v. Hoot, Inc.*, 2008 ND 117, ¶ 34, 751 N.W.2d 206 (citation omitted) ("To apply the alter ego doctrine, 'there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the share-holder do not in reality exist,' and 'there must be an inequitable result if the acts in question are treated as those of the corporation alone.'").

[¶ 20]   The factors to be considered when a court determines whether to pierce the corporate veil are set forth in *Hilzendager v. Skwarok*, 335 N.W.2d 768 (N.D.1983), and *Jablonsky v. Klemm*, 377 N.W.2d 560 (N.D.1985).   In *Hilzendager*, 335 N.W.2d at 774, we said:

> [F]actors considered significant in determining whether or not to disregard the corporate entity include:   insufficient capitalization for the purposes of the corporate undertaking, failure to observe corporate formalities, nonpayment of dividends, insolvency of the debtor corporation at the time of the transaction in question, siphoning of funds by the dominant shareholder, nonfunctioning of other officers and directors, absence of corporate records, and the existence of the corporation as merely a facade for individual dealings.   *Victoria Elevator Co. v. Meriden Grain Co.*, 283 N.W.2d 509, 512 (Minn.1979).

In *Jablonsky*, 377 N.W.2d at 564, we added that "an element of injustice, inequity or fundamental unfairness must be present before a court may properly pierce the corporate veil."

[¶ 21]   In   *Intercept   Corp.*, 2007 ND 180, ¶ 15, 741 N.W.2d 209 (citations omitted), we explained:

> The burden of establishing the necessary elements for piercing the corporate veil rests on the party asserting the claim.   Resolving the issue is heavily fact-specific and, therefore, is within the sound discretion of the district court.   The court's findings of fact are presumed to be correct, and will be reversed on appeal only if they are clearly erroneous.

[¶ 22] The district court made extensive findings under each of the *Hilzendager–Jablonsky* factors and found that all of the factors favored piercing the corporate veil. The court found there was insufficient capitalization for the purposes of the corporate undertaking:

While it appears to the Court that Nu–Tec was adequately capitalized at the time it entered into the Standard Sub–Contract Agreement with Coughlin, the evidence indicates that its capital position declined significantly in each of the three (3) years following Nu–Tec's ill-fated attempt to install the 24" water line on the 16th St. Project—and Nu–Tec's most recent financial statements indicate that it will be wholly unable to satisfy the judgment which will be entered against it in this case.

The numbers presented to the Court indicate that while Nu–Tec had capital in excess of $345,000.00 at the end of 2002 (the year the Standard Sub–Contract was entered into), that figure had declined to less than $166,000.00 at the end of 2004 (the last year for which financial data was available for Nu–Tec). These numbers also show that while Nu–Tec had cash on hand of over $230,000.00 at the beginning of 2002, by the end of 2004 that amount had dropped to a rather paltry $9,690.00. The Court finds that this financial downturn of the corporation is largely attributable not to operating losses sustained by the corporation since the end of the 16th St. Project, but, rather, to the shareholders' actions of withdrawing almost $165,000.00 in cash from the company *after* becoming aware of Coughlin's claim.

The Court also notes that the capital position of the company, as reflected in its financial statements, does not take into account its potential liability to Coughlin on this claim, or, as a corollary,

its potential inability to collect a disputed receivable from Coughlin for work performed on the 16th St. Project.

[¶ 23] The district court found that "Nu–Tec's principals essentially failed to observe *any* corporate formalities" required by North Dakota law, N.D.C.C. ch. 10–19.1, and by Nu–Tec's corporate bylaws. The court noted there were no corporate records of notices of meetings of shareholders, notices of meetings of the board of directors, minutes of meetings of shareholders, minutes of meetings of the board of directors, promissory notes for "so called" shareholder loans, loan agreements for "so called" shareholder loans, board of directors resolutions authorizing shareholder loans, board of directors resolutions authorizing corporate borrowings from shareholders, board of directors resolutions setting the length of term for shareholder loans, board of directors resolutions authorizing the repayment of shareholder loans, loan documents between the corporation as a borrower and the shareholders as lenders, and board of directors or shareholders resolutions authorizing the payment of dividends. The court further noted, " 'not a single meeting [of the shareholders or directors] was documented by minutes in the past decade or more Nu–Tec was in business.' "

[¶ 24] The court found nonpayment of dividends favored piercing the corporate veil:

The evidence unequivocally indicates that Nu–Tec has paid dividends on only two (2) occasions since the company came into being in 1992—once in 1999, and again in 2003. The 2003 distributions (totaling $60,000.00): (i) were the largest in company history; (ii) were made at a time when Nu–Tec was facing a substantial damage claim from Coughlin in relation to Nu–Tec's work on the

16th St. Project; and, (iii) were made in a year in which the company had zero ($0.00) revenue, reported a significant loss ($20,263.00) and was experiencing diminishing capital.

Perhaps not surprisingly in the face of this negative financial information, Nu–Tec was unable to produce any written documentation showing that its board of directors had made the required (by law) determination that the company could meet its obligations going forward if these distributions were made.

The court also found that Nu–Tec "is essentially insolvent and unable to pay the judgment which will be entered against it in this case" because "Nu–Tec currently owns no real estate, very little equipment and few 'hard' assets—and its cash position is only a shadow of what it was before this situation (i.e., the saga of the 'stuck' pipe) came about."

[¶ 25] The court analyzed in detail the siphoning of funds by the dominant shareholder:

There is no disagreement that Ronald Balzer is Nu–Tec's *dominant shareholder.*

The evidence indicates that, from December of 2002, through October of 2003, Nu–Tec's shareholders received a total of approximately $164,000.00 from the company in the form of bonuses, dividends, repayment of shareholder loans and payment of interest on shareholder loans. Of this total, Ronald Balzer received, by far, the lion's share. According to his own testimony, Ronald Balzer received: (i) $27,000.00 of the $60,000.00 in dividends which were distributed in 2003; (ii) a $20,000.00 bonus on December 31, 2002; (iii) $52,000.00 in repayment of a shareholder loan on December 11, 2002; (iv) $20,000.00 in repayment of a shareholder loan on December 1, 2002; and, (v) a $5,518.00 interest payment (on a shareholder loan) on December 31, 2002. So, from December of 2002, through October of 2003, Ronald Balzer received a total of $124,518.00 from Nu–Tec—and the company's other shareholders received a total of "just over $39,000.00" during this time frame—with all of these transactions having taken place *after* Nu–Tec had been put on notice of Coughlin's claim against Nu–Tec in connection with the 16th St. Project.

All the while these funds were being funneled from Nu–Tec to its shareholders, primarily Ronald Balzer, Nu–Tec's principals knew—or reasonably should have known—that: (i) the corporation was experiencing significant financial losses (i.e., $58,935.00 net loss before taxes in 2002; $20,263.00 in 2003; and, $128,577.00 in 2004); (ii) the corporation's cash position was deteriorating (i.e., Nu–Tec had $226,221 in cash at the end of 2002; $168,623.00 at the end of 2003; and, $9,690.00 at the end of 2004); and, (iii) the corporation's assets and equity were diminishing. Ronald Balzer also testified that he has "no idea" as to the present cash position of Nu–Tec, and further stated that no additional paid-in capital has been put into the company since its original capitalization.

[¶ 26] The court found other officers and directors of the corporation were non-functioning on the basis of the lack of written documentation, Ronald Balzer's "uncertain[ty]" who the officers and directors were, and Ronald Balzer's nearly exclusive control of the corporation. The court found "Nu–Tec has maintained very little in the way of corporate records over the years," including no notes, loan agreements, security agreements, borrowing resolutions, "or other evidence of indebtedness to substantiate these purported loans," and no "written record of any ac-

tion taken by Nu–Tec's Board of Directors authorizing the distribution of $60,000.00 in dividends in 2003, likely one of the worst revenue years the company ever experienced." The court found that "Nu–Tec is (and it appears always has been) the alter ego of Ronald Balzer" because there was no "*hint* that any of the other shareholders were actively involved in running th[e] company." Finally, the court found "it would be *unfair, inequitable* and *unjust* to allow Nu–Tec's shareholders to hide behind the corporate shield and avoid responsibility for payment of any judgment entered against Nu–Tec in this case."

[¶ 27] Contrary to the assertions of Nu–Tec and the Balzers, the district court's findings are supported by the evidence. Although Nu–Tec and the Balzers contend there was no siphoning of corporate funds and attempt to attribute the precipitous decline in the financial condition of Nu–Tec to "bad luck" with other jobs undertaken in Florida, the district court did not find these explanations credible. The district court decides credibility issues in a bench trial, and we will not reassess credibility on appeal. *B.J. Kadrmas, Inc., v. Oxbow Energy, LLC,* 2007 ND 12, ¶ 7, 727 N.W.2d 270.

[¶ 28] We also disagree with the contention that the district court misapplied the law. Nu–Tech and the Balzers argue the court placed undue emphasis on insufficient capitalization, because Nu–Tec was adequately capitalized when it entered into the subcontract agreement with Coughlin and performed the work, and because this is a contract rather than a tort action. However, there is a continuing obligation to provide adequate risk capital from incorporation throughout the corporation's existence. *Axtmann,* 2007 ND 179, ¶ 14, 740 N.W.2d 838; *Jablonsky,* 377 N.W.2d at 566. Furthermore, although undercapitalization is less significant in a contract case

in which the claim arises from a consensual transaction, *see Axtmann,* at ¶ 14; *Jablonsky,* 377 N.W.2d at 565 n. 1, undercapitalization remains a relevant factor in a contract case. *See Fontana v. TLD Builders, Inc.,* 362 Ill.App.3d 491, 298 Ill.Dec. 654, 840 N.E.2d 767, 779–80 (2005). It is difficult to imagine how error can be predicated on a court's placing undue emphasis on any single factor when it has found all nine factors favor piercing the corporate veil.

[¶ 29] Nu–Tec and the Balzers argue that despite the district court's detailed findings, the court erred because it merely focused on the inability of Nu–Tec to satisfy the judgment when it was entered. In *Axtmann,* 2007 ND 179, ¶ 16, 740 N.W.2d 838, a majority of this Court upheld the district court's decision to pierce the corporate veil when the district court found three factors supported piercing and the corporation "was insolvent and could not pay its debts at the time of the Axtmanns' judgment and for several years before that judgment." The same is true here.

[¶ 30] The district court's findings depict a dominant shareholder of a corporation who, through the issuance of dividends and bonuses and the repayment of undocumented "loans," attempted to bleed the corporation of assets so it would not be able to satisfy a known corporate liability. We conclude the district court's decision to pierce the corporate veil is not clearly erroneous.

V

[¶ 31] The judgment, amended judgment, and order are affirmed.

[¶ 32] GERALD W. VANDE WALLE, C.J., BRUCE E. BOHLMAN, S.J., DALE V. SANDSTROM, and CAROL RONNING KAPSNER, JJ.

[¶ 33] The Honorable BRUCE E. BOHLMAN, S.J., sitting in place of MARING, J., disqualified.

CROTHERS, Justice, concurring specially.

[¶ 34] I agree with the results in this case and with most of the rationale supporting these results. I write separately to reiterate my disagreement with this Court's application of the "undercapitalization" analysis used in corporate veil piercing cases. *See Axtmann v. Chillemi*, 2007 ND 179, ¶¶ 40–41, 740 N.W.2d 838 (Crothers, J., concurring in part and dissenting in part). Here, however, overwhelming evidence supports piercing Nu–Tec's corporate veil under the remaining factors, and any consideration of its undercapitalization is superfluous.

[¶ 35] Daniel J. Crothers