# IN THE SUPREME COURT
## STATE OF NORTH DAKOTA

### 2020 ND 108

Traynor Law Firm, PC,  Plaintiff, Appellant and Cross-Appellee

v.

State of North Dakota,

c/o Governor Doug Burgum;  Defendant, Appellee and Cross-Appellant

and

The Board of Ward County Commissioners,  Defendant and Appellee

### No. 20190310

Appeal from the District Court of Ward County, North Central Judicial District, the Honorable Gary H. Lee, Judge.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

Opinion of the Court by Crothers, Justice.

Jonathon Yunker (argued) and Jason P. Sayler (on brief), Devils Lake, ND, for plaintiff, appellant and cross-appellee.

James E. Nicolai, Office of Attorney General, Bismarck, ND, for defendant, appellee and cross-appellant.

Howard D. Swanson, Special Assistant State's Attorney, Grand Forks, ND, for defendant and appellee.

**Crothers, Justice.**

[¶1]   Traynor Law Firm, PC, appeals the district court judgment awarding 6% interest on a bill for legal services. The State of North Dakota cross-appeals and argues Ward County is responsible for paying Traynor's bill, and the district court erred awarding any interest. We affirm in part, reverse in part and remand for further proceedings.

[¶2]   Dustin Irwin died on October 6, 2014, in the Ward County jail. The circumstances of his death led to an investigation and criminal charges against Ward County Sheriff Steven Kukowski. Initially, Divide County State's Attorney Seymour Jordan was appointed to handle the criminal proceeding. Jordan determined the circumstances justified a petition for removal of Sheriff Kukowski from office. Governor Jack Dalrymple appointed Jordan as the special prosecutor for the removal. Ultimately, Jordan requested to withdraw and Governor Burgum appointed attorney Daniel Traynor as the special prosecutor. After completion of the removal proceedings, Traynor submitted his bill to the State on May 1, 2017. The State forwarded the bill to Ward County. Ward County refused to pay the bill.

[¶3]   Traynor sued the State and Ward County to recover the unpaid fees. The State responded to Traynor's complaint by filing a motion to dismiss. Ward County answered Traynor's complaint and cross-claimed against the State. The State moved to dismiss Ward County's cross-claim. Traynor moved for judgment on the pleadings. The district court entered judgment in Traynor's favor against the State, and awarded interest at 6% per annum under Chapter 47-14, N.D.C.C., starting June 1, 2017. The court dismissed Traynor's claim against Ward County.

I

[¶4]   The State and Ward County do not dispute the amount of Traynor's fees. The disputes are *who* is responsible to pay those fees and whether interest is recoverable. Therefore, the issue is one of law. Questions of law are reviewed

de novo on the entire record. *Bladow v. Bladow*, 2005 ND 142, ¶ 9, 701 N.W.2d 903. However, the determination of whether a contract existed between Traynor and either defendant is a mixed question of law and fact. This Court "fully review[s] conclusions of law and mixed questions of law and fact under the de novo standard." *Burlington Northern R.R. v. Fail*, 2008 ND 114, ¶ 5, 751 N.W.2d 188.

II

[¶5]  The State argues Ward County must  pay Traynor's bill because Chapter 44-11, N.D.C.C., fails to address who should pay for the special prosecutor fees in a county official's removal proceeding, and therefore the catch-all provision in N.D.C.C. § 54-12-03 applies. The State argues N.D.C.C. § 54-12-03 mandates Ward County is responsible to pay expenses incurred in prosecuting any case resulting from an investigation by the Attorney General.

[¶6]  Ward County argues neither Chapter 44-11, N.D.C.C., nor Chapter 54-12, N.D.C.C., imposes an obligation upon a county to pay the fees of an attorney appointed by the Governor for proceedings for the removal of a public official.

[¶7]  Chapter 44-11, N.D.C.C., establishes the procedure for when an officer is removed by the Governor. Section 44-11-01, N.D.C.C., states, "The governor may remove from office any county commissioner, sheriff . . . whenever it appears to the governor by a preponderance of the evidence after a hearing as provided in this chapter, that the officer has been guilty of misconduct. . . ." Here, Ward County Sheriff, Steven Kukowski, was the public official to be removed. Therefore, Chapter 44-11, N.D.C.C., applies to these proceedings.

[¶8]  Section 44-11-02, N.D.C.C., provides the process and in pertinent part states:

> "1. The petition against any official authorized to be removed by the governor must be entitled in the name of this state and must be filed with the attorney general.
> . . . .
> 4. When the petition is filed, the attorney general shall conduct an investigation within thirty days. Upon completion of the

2

investigation, the attorney general shall make a recommendation to the governor whether a removal proceeding should be conducted by a special commissioner, and if so, whether the accused officer should be suspended during the pendency of the proceeding.

5. Upon receipt of the recommendation of the attorney general the governor shall determine whether to proceed with the appointment of a special commissioner. . . . If the governor decides to appoint a special commissioner, the governor shall request that a prosecutor draft and serve the official complaint against the officer.

> a. When the officer sought to be removed is other than the state's attorney, the state's attorney or other competent attorney, upon request of the governor, shall appear and prosecute."

[¶9] The State argues N.D.C.C. § 54-12-03 applied on its own and mandates Ward County is responsible to pay Traynor's fees. Section 54-12-03, N.D.C.C., authorizes the attorney general to investigate and prosecute criminal matters in counties. It states:

"The attorney general may make an investigation in any county in this state to the end that the laws of the state shall be enforced therein and all violators thereof brought to trial, when:
> 1. The attorney general deems it necessary for the successful enforcement of the laws of the state in such county;
> 2. Requested by a majority of the members of the board of county commissioners of the county; or
> 3. Petitioned by twenty-five taxpaying citizens of the county.
The necessary expenses incurred in making the investigation or in prosecuting any resulting case, as determined by the attorney general and not otherwise specifically provided by law, must be paid by the county out of the state's attorney's contingent fund. All such expenses paid from the state's attorney's contingent fund must be paid by the county treasurer upon the warrant of the county auditor. The warrant must be executed and delivered by the auditor in an amount and to the person designated therein upon the written order of the attorney general."

[¶10] The district court concluded Chapter 44-11, N.D.C.C., is silent regarding the payment of special prosecutor fees in a removal proceeding, and it is not

necessary or required to import N.D.C.C. § 54-12-03 into Chapter 44-11. The district court explained:

> "The plain language of the Chapter and the Statute do not support North Dakota's argument. Section 54-12-03, NDCC, provides the Attorney General with the authority to make an investigation when the Attorney General deems it necessary for successful enforcement of the laws, is requested to do so by a majority of the members of the Board of County Commissioners, or is petitioned by twenty-five taxpaying citizens of the county. None of these events occurred. Chapter 44-11, NDCC, requires the Attorney General to make an investigation and make a recommendation to the Governor upon the filing of a petition for removal of a public officer. Filing a petition of removal required by Chapter 44-11, NDCC, is not included in Section 54-12-03, NDCC.

> "Section 54-12-03, NDCC, authorizes the Attorney General to conduct investigations, and to charge the fees for the Attorney General's expenses. The fees of the investigation is then the responsibility of the county, and are to be paid [from] the State's Attorney's contingency fund. However, it is the Governor, not the Attorney General, who makes the decision whether a removal proceeding should be initiated. Section 4[4]-11-02, NDCC. The expenses incurred in a removal proceeding are those made necessary by the actions of the Governor as a result of the exercise of his powers. The expenses incurred are not the expenses of the Attorney General, but rather the expenses incurred by the Special Prosecutor. It would seem therefore that absent some legislative directive that would shift the cost of the investigation to some other public entity that the expenses of Special Prosecutor in a removal proceeding are the responsibility of the Governor.

> "The plain language of Section 44-11-01, NDCC, by its scope, also removes the Chapter from Section 54-12-03, NDCC. As noted above, Section 44-11-01, NDCC, allows the Governor to remove not only county officials, but school board members, city officials, township officials, and other governmental officers. The removal proceeding is the same for all. That is, a petition for removal is filed. The Attorney General investigates and makes recommendations to the Governor. The Governor then determines whether the removal process should go forward. A Special

Prosecutor is called in. There is no authority in Section 54-12-03, NDCC, to pass the costs of the Special Prosecutor on to other governmental entities such as school boards, cities, or townships. Importing Section 54-12-03, NDCC, into Chapter 44-11, NDCC, would mean that in a removal proceeding only counties would pay the expenses of the Special Prosecutor from the State's Attorney's contingency fund[.] All other governmental entities would get a free pass. North Dakota offers no reasonable explanation for why the legislature would impose this burden only on the counties, but not on school boards, cities, townships, or the like.

"Chapter 44-11, NDCC, is silent regarding the payment of the Special Prosecutor in a removal proceeding. It is not necessary, or required to import Section 54-12-03, NDCC, into Chapter 44-11, NDCC.

"When the Code is silent on a particular issue, the common-law then prevails. *Lembke v. Unkie*, 171 NW2d 837 (ND 1969); *Estate of Conley*, 2008 ND 148, 753 NW2d 384."

[¶11] We agree with the district court's determination. Therefore, because Chapter 44-11 is silent on who pays attorney fees, the analysis must be done under contract law.

III

[¶12] Traynor argues although no formal "retainer agreement" existed between it and the State, written instruments, correspondence, and conduct establish an implied contract. Traynor also argues the silence or inaction of the State regarding the interest rate on the invoice constituted acceptance or assent.

[¶13] The State argues the district court conflated the existence of an attorney-client relationship with an obligation to pay and, without a written agreement, Traynor is not entitled interest at its purported contract rate of 1.5% per month.

[¶14] The district court concluded as a matter of contract law an attorney-client relationship existed between Traynor and the State, but no *written*

5

*contract* existed between them, and therefore the 6% per annum interest rate under Chapter 47-14, N.D.C.C., applied.

[¶15] An attorney-client relationship exists as a matter of common law of contracts when parties explicitly, or implicitly agree that the attorney will provide legal services to the client. *Veit v. Anderson*, 428 N.W.2d 429 (Minn. Ct. App. 1988). The relationship is established when a party seeks and receives the assistance of an attorney on legal matters. *In re: Disciplinary Action Against Giese*, 2003 ND 82, ¶ 17, 662 N.W.2d 250.

[¶16] A contract requires parties capable of contracting, consent of the parties, a lawful object, and sufficient consideration. N.D.C.C. § 9-01-02. A contract can be either express or implied. N.D.C.C. § 9-06-01. "An express contract is one the terms of which are stated in words. An implied contract is one the existence and terms of which are manifested by conduct." *Id*. In *Zirnhelt v. Ransom Cnty.*, 137 N.W.2d 785, 789 (N.D. 1965), this Court noted:

> "A contract is implied where a person performs services, furnishes property, or expends money for another, at such other's request, and there is no express agreement as to compensation. A promise to pay for the reasonable value of the service or property so furnished, or to reimburse for money so expended, may be implied where, and only where, the circumstances warrant such implication."

[¶17] Traynor cites *B.J. Kadrmas, Inc. v. Oxbow Energy, LLC*, 2007 ND 12, 727 N.W.2d 270, to support its argument that in this case silence and inaction operated as acceptance. The State argues *Oxbow Energy* does not control because the contract at issue in *Oxbow Energy* was not a bill for legal services subject to the reasonableness requirements of Rule 1.5(a) of the North Dakota Rules of Professional Conduct.

[¶18] In *Oxbow Energy*, Petrosearch and Oxbow contracted with Oil for America (OFA) to drill wells on land OFA leased or sought to lease. 2007 ND 12, ¶ 2, 727 N.W.2d 270. Robert Angerer from OFA met with Bev Kadrmas to discuss having her company perform title searches on various lands. *Id*. He asked her to make separate agreements with him on behalf of OFA, Dan

6

Denton for Petrosearch, and Tony Martin for Oxbow. *Id.* OFA and Petrosearch signed contracts with Kadrmas and paid for their portion of the title work. Oxbow did not. *Id.* Kadrmas testified Martin told her to proceed with Oxbow's share during a telephone conversation. That same day she sent Martin a letter memorializing the conversation with him and enclosing a contract for Martin to sign. *Id.* at ¶ 3.

[¶19] The district court concluded an implied contract existed between the parties. *Oxbow Energy*, 2007 ND 12, ¶ 14, 727 N.W.2d 270. The surrounding circumstances and conduct of the parties were relevant to ascertain whether they intended to form a binding legal agreement. *Id.* In the written contract Kadrmas explained her daily labor rate, additional expenses charged, and the land tracts to be searched. *Id.* at ¶ 15. Kadrmas hired additional workers and incurred substantial expenses based on the conduct of the parties. *Id.* Kadrmas dutifully kept Martin informed on the progress of the work she did on his company's behalf, she emailed him for correct contact information, explained that additional landmen were hired, and informed Martin he would receive title reports "soon." Martin also updated Kadrmas with his contact information and did not dispute any of the invoices. *Id.* at ¶¶ 16-17. This Court concluded the district court's findings of fact were not clearly erroneous, and its conclusions of law were supported by its findings. *Id.* at ¶ 18.

[¶20] This case is like *Oxbow Energy* because the conduct of Traynor and the State support the conclusion that the parties mutually intended to form a binding legal obligation. All communications prior to the commencement of the representation were between the State and Traynor. The Governor sent Traynor an appointment letter and work on the removal began at the direction of the Governor. David Owens, an associate at Traynor Law Firm, testified services and fees were discussed at a meeting with the Bureau of Criminal Investigation (BCI), the attorney general, and deputy attorney general, and conversations regarding the removal happened between Traynor and the State. Upon conclusion of its services, Traynor sent the invoice to "Governor Doug Burgum, State of North Dakota." Based on these facts, the district court did not err in finding a contract existed for legal services between Traynor and the State.

7

# IV

[¶21] Traynor argues the district court erred by awarding 6% per annum interest instead of the 1.5% monthly interest rate stated on its bill. We agree.

[¶22] The district court concluded in the absence of a written contract which specifies the amount of interest to be charged, the legal rate of interest stated in N.D.C.C. § 47-14-05 applies. Chapter 47-14, N.D.C.C., relates to loans of money. Section 47-14-01, N.D.C.C., defines "loan of money" as "a contract by which one delivers a sum of money to another and the latter agrees to return at a future-time a sum equivalent to that which the person borrowed. A loan for mere use is governed by chapter 47-12."

[¶23] Traynor delivered legal services to the State and billed it for those services. There was no contract where one person agreed to loan money and another agreed to return money at a future time. Therefore, no loan of money existed. Because Chapter 47-14, N.D.C.C., applies to "loans of money" and there was no loan for money, the district court improperly applied the 6% per annum interest rate in N.D.C.C. § 47-14-05.

[¶24] Traynor argues Chapter 13-01.1, N.D.C.C., applies because Traynor falls within the plain meaning of a "business" in N.D.C.C. § 13-01.1-01. Traynor further argues the State's reliance on *Johnson v. North Dakota Workers Compensation Bureau*, 428 N.W.2d 514 (N.D. 1988), is not applicable in this matter because the *Johnson* Court applied Chapter 13-01.1, N.D.C.C., to Section 65-02-08, and this claim does not involve Title 65.

[¶25] The State responds by arguing the district court erred in awarding Traynor any interest on the underlying bill for legal services, and the Court's holding in *Johnson* excluding legal services from the word "business" in N.D.C.C. § 13-01.1-01 in reference to worker's compensation cases, applies with equal force for legal services provided under Chapter 44-11, N.D.C.C. The State argues in the alternative that Traynor is prohibited under the North Dakota Rules of Professional Conduct from charging interest at 1.5% per month.

[¶26] Section 13-01.1-01, N.D.C.C., requires prompt payment and states:

> "Every state agency . . . which acquires property or services pursuant to a contract with a business shall pay for each complete delivered item of property or service on the date required by contract between such business and agency or, if no date for payment is specified by contract, within forty-five days after receipt of the invoice covering the delivered items or services . . . ."

Section 13-01.1-02, N.D.C.C., states when an interest payment is required:

> "Interest must accrue and be made on payments overdue under section 13-01.1-01 at the rate of one and three-fourths percent per month, unless a different rate is specified within the contract upon which the claim is based. Interest must accrue beginning on the day after payment is due, if payment due date is specified by contract, or on the day of receipt of the invoice covering the delivered goods or services, if payment is not made within forty-five days. Interest ceases to accrue on the date payment is made."

[¶27] Section 13-01.1-03, N.D.C.C., states when interest must compound, noting, "Any interest which remains unpaid at the end of any forty-five-day period or which remains unpaid at the end of any specified period provided by contract must be added to the principal amount of the debt and must thereafter accumulate interest."

[¶28] This Court discussed Chapter 13-01.1 in *Johnson v. North Dakota Workers Compensation Bureau*, 428 N.W.2d 514 (N.D. 1988). In *Johnson*, Margaret Johnson argued she was not fully reimbursed for the expenses of traveling to and from medical and rehabilitation treatments. She requested twenty cents per mile for the cost of driving her own vehicle and a per diem allowance for food and lodging at the same rate as state employees. *Id.* at 515. Johnson argued the Bureau must "pay interest on bills or legal services which were not timely paid as provided by Chapter 13-01.1." *Id.* at 519. This Court explained that on its face Chapter 13-01.1 makes no reference to payment for legal services and the term business "may imply an ambiguity." *Id.* at 519. The Court looked at the legislative history for Chapter 13-01.1 and determined, "the legislation is intended to stimulate governmental entities to make prompt

payment to the small retail businesses which provide them goods and services." *Id*. at 519-520 and n.6. This Court stated, "[w]e decline to broaden the Legislature's interpretation of 'business' as used in Chapter 13-01.1 to include legal services rendered to Worker's Compensation claimants. We therefore conclude that Chapter 13-01.1, N.D.C.C., does not compel the Bureau to pay interest on attorneys' fees." *Id*. at 520.

[¶29] This case is different than *Johnson*. 428 N.W.2d 514. Johnson sought reimbursement of attorney fees from a third party, the Workers Compensation Bureau. The Bureau was required to pay Johnson's attorney fees. *Id*. at 519. Here, Traynor was not seeking reimbursement and interest from a third party. Rather, it sought payment from a client. Therefore, *Johnson v. North Dakota Workers Compensation Bureau*, 428 N.W.2d 514 (N.D. 1988), must be limited to the facts in that case.

[¶30] "Interpretation of a statute is a question of law fully reviewable on appeal. Our primary goal in statutory construction is to ascertain the intent of the legislature, and we first look to the plain language of the statute and give each word of the statute its ordinary meaning." *PHI Fin. Servs., Inc. v. Johnston Law Office, P.C.,* 2020 ND 22, ¶ 10, 937 N.W.2d 885. In 1985 when Chapter 13-01.1 was enacted, *Black's Law Dictionary* defined "business" as:

> "Employment, occupation, profession, or commercial activity engaged in for gain or livelihood. Activity or enterprise for gain, benefit, advantage or livelihood . . . . That which habitually busies or occupies or engages the time, attention, labor, and effort of persons as a principal serious concern or interest or for livelihood or profit."

BUSINESS, *Black's Law Dictionary* (5th ed. 1979) (internal citations omitted).

[¶31] The evidence here shows Traynor was engaged in a commercial activity for gain or livelihood. David Owens, an associate at Traynor Law Firm, testified:

> "[P]racticing law at this firm is my livelihood. I have no other source of income from ancillary employment or what can be

considered a part-time job. I believe the same can be said of many of my colleagues. We engage in commercial activities of providing legal services through our trade of practicing law."

Owens testified Traynor Law Firm is a professional corporation that is registered with the secretary of state, and that the North Dakota Business Corporation Act states a corporation may be incorporated under the chapter for any lawful business purpose or purposes. He testified, "my reading leads me to believe that 'incorporation' has general business purposes and there is a presumption to that."

[¶32] Under the facts in this case, Traynor is a "business" under N.D.C.C. § 13-01.1-01. Because the State and Traynor had an implied contract, and Traynor's activities fall within the plain meaning of "business," N.D.C.C. § 13-01.1-01 applies.

[¶33] Here, the State has not made a payment. Therefore, the State's payments are overdue under N.D.C.C. § 13-01.1-01 and N.D.C.C. § 13-01.1-02 applies. It states, "Interest must accrue and be made on payments overdue under section 13-01.1-01 at the rate of one and three-fourths percent per month, unless a different rate is specified within the contract upon which the claim is based." Here, an implied contract existed. Traynor's invoice noted a 1.5% monthly interest rate. Therefore, a different rate is specified, and the 1.75% interest rate does not apply. Under N.D.C.C. § 13-01.1-03, any interest which remains unpaid at the end of 45 days must be added to the principal amount of the debt and must thereafter accumulate interest. As a matter of law the State is responsible to pay 1.5% interest compounded after 45 days as required by N.D.C.C. §§ 13-01.1-02 and 13-01.1-03.

[¶34] The State argues Rule 1.5 of the North Dakota Rules of Professional Conduct prohibits Traynor from charging 1.5% monthly interest because the invoice charging 1.5% interest after 30 days is a unilateral attempt to charge a client interest on a delinquent account.

[¶35] Rule 1.5 of the North Dakota Rules of Professional Conduct in pertinent part states:

"(a) A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

(b) When the lawyer has not regularly represented the client, the basis, rate, or amount of the fee and expenses for which the client will be responsible shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation."

[¶36] Rule 1.5 of the North Dakota Rules of Professional Conduct is clear when the lawyer does not regularly represent the client, as was the case here, the basis, rate, or amount of fee and expenses should be communicated to the client *preferably in writing*. No writing was provided. However, Traynor was appointed as special prosecutor under statute. *See* Ch. 44-11, N.D.C.C. When

the bill must be paid also is controlled by statute. N.D.C.C. § 13-01.1-01. If the bill is not timely paid, the rate of interest is stated in N.D.C.C. § 13-01.1-02. The fact that Traynor requested less than the statute authorizes indicates the rate of interest is reasonable under Rule 1.5 of the North Dakota Rules of Professional Conduct. Interest at that rate may be collected after 45 days as permitted by N.D.C.C. § 13-01.1-02, rather than after 30 days as stated on Traynor's statement.

V

[¶37] We affirm in part and reverse in part, and remand for further proceedings consistent with this opinion.

[¶38] Daniel J. Crothers
     Jerod E. Tufte
     Dann E. Greenwood, D.J.
     Daniel D. Narum, D.J.
     Jon J. Jensen, C.J.

[¶39] The Honorable Dann E. Greenwood, D.J., sitting in place of VandeWalle, J., disqualified.

[¶40] The Honorable Daniel D. Narum, D.J., sitting in place of McEvers, J., disqualified.